(No. 71184.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MADISON HOBLEY, Appellant.

*Opinion filed March 31, 1994.—Rehearing denied May 27, 1994.*

Michael H. King, Kurt H. Feuer, Kelly J. Bugle, and Jon K. Stromsta, of Ross & Hardies, of Chicago, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

On February 18, 1987, Madison Hobley was charged by indictment in Cook County with murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2)), felony murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)), arson (Ill. Rev. Stat. 1985, ch. 38, par. 20—1(a)), and aggravated

arson (Ill. Rev. Stat. 1985, ch. 38, pars. 20—1.1(a)(1), (a)(2)). These charges related to a January 6, 1987, fire that left seven persons dead, injured several others, and badly damaged a three-story apartment building at 1121-23 East 82nd Street in Chicago. Defendant entered a plea of not guilty to all counts. The jury returned verdicts of guilty against defendant on seven counts of felony murder, one count of arson and seven counts of aggravated arson.

The death penalty phase of defendant's trial was bifurcated. At the first stage, the jury found defendant eligible for the death penalty. At the second stage, the jury found no mitigating factors sufficient to preclude imposition of the death penalty. The trial court sentenced defendant to death. Defendant filed motions for a new trial and sentencing hearing, and the trial court denied these motions. Defendant's death sentence has been stayed pending direct review by this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603; Ill. Rev. Stat. 1985, ch. 38, par. 9—1(i)).

### Statement of Facts

On January 6, 1987, at approximately 2 a.m., a fire broke out in an apartment building located at 1121-23 East 82nd Street in Chicago. The fire claimed the lives of seven persons: Anita and Philip Hobley (defendant's wife and son), Anthony Bradford, Johnny Dodd, Shelone Holton, Schalise Lindey and Robert Stephens. The cause of death for each victim was determined to be acute carbon monoxide toxicity. Numerous others were burned while escaping from the fire, or severely injured when they leapt from windows.

The three-story apartment building had hallways which ran the length of the building on each floor, and there was a staircase at each end of the building. The south stairwell collapsed during the fire. Analysis of the stairwell debris revealed traces of gasoline. Fire investi-

gators determined that the fire was started in the south stairwell.

At the time of the fire, defendant lived in apartment 301 with his wife and 15-month-old son. Apartment 301 was located directly across from the south stairwell on the third floor of the apartment building. There was conflicting testimony as to whether gasoline was poured on the door of apartment 301. The door and door jam of apartment 301 were almost completely burned away, but tests of the area revealed no traces of gasoline. The State's expert testified that a peculiar burn pattern on the floor in front of the door showed gasoline had been poured there, but that the water used to extinguish the fire could have washed away all traces of gasoline. Defendant's expert testified that the burn pattern was caused by a "chimney effect" created when the fire moved up the south stairwell.

At trial, Andre Council testified that on the night of the fire he stopped at an Amoco station located at 83rd and Cottage Grove in Chicago. Council remained at the station to visit with the gas station attendant, Kenneth Stewart. While he was at the gas station, Council allegedly saw a man in a dark peacoat approach the station on foot carrying a gasoline container. The man purchased $1 worth of gasoline. Council stated that the lighting at the station was excellent, and he was standing within five feet of the man while the man pumped the gas. Council further stated that he paid particular attention to the man because while the man was filling his gas container, he spilled some gasoline on Council's car. Approximately 30 to 45 minutes after the man had left, Council saw fire trucks go past the Amoco station. The fire trucks were heading in the direction of Council's home, so he left the Amoco station.

Upon arriving home, Council noticed that the fire trucks had stopped at a building located approximately

one block from where he lived. Council walked over to the fire scene, and he noticed the man who had purchased the gasoline standing near the building. While watching television the next day, Council saw a picture of defendant on the news identifying him as a suspect detained by police in connection with the fire investigation. Council recognized defendant as the man whom he had seen buy gasoline the night before, and telephoned the police to report the incident.

Kenneth Stewart, the Amoco station attendant, also testified for the State. He stated that a short man entered the station with a gas container and bought $1 worth of gasoline. Stewart stated that the lighting conditions were excellent, but that he only saw the man's face for three to four seconds. The day after the fire, the police brought Stewart to view a lineup. Initially, Stewart was unable to identify defendant in the lineup. The police then asked Stewart if he could identify with any degree of certainty any person in the lineup. Once again, Stewart was not able to identify defendant. Finally, the police asked if any of the men in the lineup could have been the man who bought the gasoline. Stewart then identified defendant as "favoring" the man who purchased the gasoline, but stated he could not be 100% sure that it was the same man.

Defendant claims that on the night of the fire, he awoke to the smell of smoke. Defendant allegedly shook his wife awake and went to the front door of the apartment and out into the hallway. After he had walked 40 to 50 feet down the hallway, he turned around to discover the hallway had filled with smoke and flames. Defendant claims that he bent low and exited through the door at the north side of the building.

Defendant testified that after exiting the burning apartment building, he used the phone at a neighbor's house to call his mother, Myra Hobley. Defendant

requested that Ms. Hobley bring him some clothes. When Ms. Hobley arrived, she took defendant to her apartment. After arriving at his mother's house, defendant appeared to be extremely upset. At approximately 4 a.m., an ambulance was called so that defendant might obtain a sedative. The paramedics arrived and took defendant to the hospital. Defendant's sister, Robin Milan, accompanied defendant to the hospital. Once at the hospital, some tests were run on defendant. Soot was found in his nostrils, and the doctor diagnosed defendant as suffering from smoke inhalation. The doctor proposed more tests be performed, but declined to give defendant a sedative. At this point, Robin apparently became upset and removed defendant from the hospital. After defendant and Robin left the hospital, they returned to their mother's home.

Chicago police department Detective Robert Dwyer was assigned to investigate the fire. The morning after the fire, Dwyer and his partner, Detective James Lotito, went to the medical examiner's forensic institute to identify the victims of the fire. While at the morgue, Dwyer spoke with Myra (Penny) Hobley, defendant's other sister. Penny had gone to the morgue to identify Anita and Philip Hobley. Penny informed Dwyer that defendant was at his mother's home at 8006 South Rhodes.

At approximately 9 a.m. the same morning, Dwyer, Lotito and two other officers went to 8006 South Rhodes to interview defendant. After identifying themselves, Dwyer and Lotito were invited in. Approximately 15 family members had congregated in the apartment. Dwyer suggested to defendant that it might be easier if they spoke outside in Dwyer's vehicle. Defendant agreed.

While Dwyer, Lotito and defendant were seated in Dwyer's vehicle, Dwyer told defendant that the fire had been deliberately set through the use of a liquid

accelerant. When asked if he knew who could have started the fire, defendant stated that he suspected a woman named Angela McDaniels. Apparently, McDaniels had a relationship with defendant, but that relationship had been strained since defendant returned to his wife. Dwyer and Lotito then asked defendant if he would come to Area Two Police Headquarters (Area 2) for further questioning. Defendant agreed to accompany the officers.

Once at Area 2, defendant claims that Dwyer placed him in an interview room, handcuffed him to a wall ring, and began to physically abuse and racially harass him. Defendant allegedly requested that he be allowed to contact an attorney, but Dwyer would not allow it. Defendant claims that after the interview with Dwyer, he was driven to police headquarters at 11th and State (headquarters). Once at headquarters, Sergeant Garrity allegedly handcuffed defendant to a chair and began asking him a series of questions. Defendant claims that when he denied involvement in setting the fire, Garrity began to kick him in the shins. After his interview with Garrity, defendant was allegedly escorted to another room by Dwyer, Lotito and Officer McWeeney. Defendant claims that the officers hit and kicked him, and put a plastic typewriter cover over his head. Defendant allegedly "blacked out," and when he awoke, Dwyer told him that he had interviewed McDaniels, and that defendant was in trouble. Defendant was then allowed to see an attorney, Steven Stern, who had been called by defendant's family. Defendant denied that he ever confessed to setting the fire in his apartment building.

Dwyer, Lotito, McWeeney and Garrity's testimony was widely divergent from that of defendant. Dwyer testified that after they arrived at Area 2, he learned of evidence contradicting defendant's story. Lotito therefore advised defendant of his *Miranda* rights prior to

his interview, and defendant stated he understood. During defendant's interview, he provided Dwyer with McDaniels' address and phone number, but did not confess to involvement in setting the fire. Dwyer then asked if defendant would be willing to be interviewed by an officer at headquarters.

While defendant went to headquarters, Dwyer and Lotito attempted to locate McDaniels. They interviewed McDaniels over her lunch hour, and she denied any involvement in setting the fire. She claimed that several days prior to the fire, defendant had expressed a desire to reconcile. Defendant allegedly proposed to McDaniels that she move in with his wife and son. McDaniels stated that she refused, and that she informed defendant he must choose between his wife and her.

When defendant arrived at headquarters, he was taken to see Sergeant Garrity. Defendant agreed to take a polygraph examination and signed a written waiver of his *Miranda* rights. After the test, Garrity informed defendant that he had reason to believe defendant had lied during the test. Defendant allegedly broke eye contact and slumped in his chair. Defendant then confessed to involvement in setting the fire. Garrity contacted Dwyer, who arrived and took defendant to an interview room. Once again, defendant was advised of his rights. Defendant purportedly repeated his confession.

During the second confession, defendant stated that he had thrown a gasoline can down the second-floor hallway after starting the fire. Dwyer sent Detective Paladino to look for the can, and Paladino found a gasoline can under the sink in apartment 206. The resident of that apartment denied ever having seen the gasoline can before.

After his confessions, Dwyer took defendant to a room where a lineup could be held. Kenneth Stewart,

the gas station attendant, was present to participate in the lineup. Before the lineup occurred, defendant's attorney, Steven Stern, arrived and spoke with defendant. The police were told not to interview defendant any further. The lineup then proceeded, with Stern present, and Stewart tentatively identified defendant.

Defendant was returned to Area 2 for booking and processing after the lineup. Defendant was handcuffed in an interview room at Area 2, and Dwyer noticed that he was pulling and wrenching on his handcuffs. This testimony was corroborated by Jane Loeb, an assistant State's Attorney of Cook County who spoke with defendant later that evening. Dwyer denied ever physically brutalizing or intimidating defendant. Garrity, Lotito and McWeeney also denied abusing defendant. The next day, photographs were taken of defendant. His wrist was scraped, and he had one small bruise in the middle of his chest.

At the close of all evidence, the jury found defendant guilty of murder, arson and aggravated arson. The capital sentencing hearing was bifurcated. At the first stage, the jury found defendant eligible for the death penalty.

In aggravation, the State called two witnesses. The first witness was Patricia Phiefer. In late November 1986, Patricia received a call from Anita Hobley asking her to come over to Anita's apartment because defendant had "abducted" Philip. Patricia took Anita home with her that night. The next morning, defendant called Patricia's apartment demanding to speak to his wife, but Anita refused. That afternoon, a brick was thrown through the window of Patricia's apartment, and she called the police. After the police had arrived, the telephone rang. One of the policemen then present picked up a second telephone and listened while Patricia spoke with the caller. Patricia testified that she

recognized the voice of the caller as defendant's. The caller asked if Patricia now would let him speak to his wife, and she refused. She then thanked the caller for breaking her window, and he said that she was welcome. The caller then told Patricia that he was going to burn down the apartment in which she lived. The second witness in aggravation was Officer Glenn Evans, the officer who listened in on Patricia's phone call. He corroborated Patricia's story.

Defendant called 27 witnesses in mitigation. Defendant's mother and sisters testified that his father had been an alcoholic, and that his parents had divorced when defendant was very young. Defendant acted as man of the house and helped to support the family financially. Other family members testified that defendant often helped out with chores and odd jobs, and that although he would occasionally take some money for his help, he never asked. Defendant was described as very kind and respectful by his family members.

Several teachers and coaches also testified in mitigation for defendant. His teachers stated that he was a good student who never caused problems in class, and his coaches testified that he was an excellent athlete who acted as a team player.

Employees at the Cook County jail testified that although approximately 85% to 90% of the inmates had some gang affiliation, defendant did not. Defendant was described as a respectful person who did not give the guards any trouble, and it was noted that defendant regularly attended Bible study classes.

A Presbyterian pastor and a Sister also testified that defendant believed in God. They stated that they believed defendant's religious beliefs to be genuine, and not an affectation to try and avoid the death penalty.

Finally, former co-workers of defendant testified that he was a good worker. Defendant worked for a medical

supplies company, and would deliver and set up various medical apparatus in the homes of the elderly. He was described as quiet, and those who worked with him stated that he seemed to enjoy helping people. It was also reported that some of the elderly people for whom defendant had set up medical apparatus asked about him and extended their prayers to him.

The jurors returned a verdict of death after concluding that there were "no mitigating factors sufficient to preclude the imposition of a death sentence." Defendant claims numerous errors in pretrial proceedings and at the guilt and sentencing phases of the trial as grounds for reversal in this court.

## DISCUSSION

### I. Pretrial Motions

#### A. Motion to Quash Arrest

Prior to trial, defendant moved to quash his arrest and to suppress the "direct and indirect products" of that arrest. The trial court denied these motions.

Defendant claims that the trial court erred in determining when he was arrested. The trial court found that defendant was not arrested until after he confessed. Defendant claims that he was arrested before his alleged confession, and that at the point of his actual arrest, the police did not have probable cause to arrest him. "An individual has not been arrested unless the circumstances are such that a reasonable man would conclude that he was not free to leave." *People v. Eddmonds* (1984), 101 Ill. 2d 44, 61.

The day following the fire, Detectives Robert Dwyer and James Lotito arrived at Ms. Hobley's apartment to question defendant. Rather than questioning defendant in the apartment, Dwyer suggested that defendant accompany him to a police vehicle because Ms. Hobley's apartment was crowded. Defendant admits that he

consented to go out to Dwyer's car. Once in the car, defendant stated that he suspected his former girlfriend, Angela McDaniels, had started the fire. Understandably, Dwyer wished to speak with defendant further on this subject. Dwyer, however, did not wish to interview defendant at length in his car because a television news van had been following him around all morning. Dwyer, therefore, asked defendant if he would come to the police station (Area 2) for further questioning.

When defendant arrived at Area 2, Dwyer learned some information about the fire that was inconsistent with defendant's story. It was for that reason that prior to interviewing defendant, Lotito read defendant his *Miranda* rights. The interview terminated with defendant's turning over McDaniels' phone number.

Dwyer testified that after the interview, he suspected defendant was "holding something back." Dwyer thought that because defendant had been involved with McDaniels, he might be trying to protect her. Dwyer therefore asked if defendant would go to the police station at 11th and State (headquarters) to take a polygraph examination. Defendant consented, and he was transported to headquarters. Once at headquarters, defendant signed a written waiver of his *Miranda* rights and was administered a polygraph examination. At the conclusion of the polygraph examination, the examiner, Sergeant Garrity, informed defendant that he had reason to believe defendant was lying. Defendant then confessed to starting the fire.

The trial judge found that defendant was not under arrest until after his confession to Garrity. We agree. Until he had confessed, defendant's status with the police was that of any interested citizen attempting to help in the investigation. Defendant was not handcuffed prior to his confession, nor was he taken any place without his consent. We believe that prior to his

confession, a reasonable person in defendant's position would have believed that he was free to leave.

Defendant's confession after the polygraph examination supplied the police with probable cause to arrest defendant. As discussed above, defendant was not arrested until after he had confessed. Accordingly, we reject defendant's contention that the police lacked probable cause to arrest defendant at the time of his arrest.

Defendant further contends that in determining when he was placed under arrest, the trial judge employed an improper test, *i.e.*, whether or not the defendant was "prevented from leaving." As stated earlier, the correct analysis to be used in determining when an arrest took place is whether a reasonable person in the defendant's situation would have considered himself free to leave. (*Eddmonds,* 101 Ill. 2d at 61; *People v. Reynolds* (1983), 94 Ill. 2d 160, 165.) Defendant points to the following statements by the trial judge:

"THE COURT: [T]he Court fails to see where the defendant's liberties and choice of leaving were prevented.

Counsel for the defense says that the defendant was prevented from leaving the station. I do not recall any testimony to that effect.

In fact, when the defendant was taken to the station, it was because he was aiding the police in developing possible suspects. *** He certainly was not under arrest at that time.

Then there was a second conversation. He did not appear to be under arrest at that time. There is no indication that he was prevented from leaving.

Counsel for the defense said he was prevented from seeing his family, prevented from making phone calls, et cetera. I do not recall any testimony to that effect.

\* \* \*

It is the Court's opinion that the defendant was not under arrest prior to this until the entire story was developed, and under the totality of the circumstances, I certainly feel that the defendant's motion will be denied."

During arguments on the motion to suppress, defendant contended that he was prevented from leaving, making phone calls and seeing his family. In his response to defendant's argument, the trial judge was merely answering defendant's contentions. The trial judge found that under the totality of the circumstances, the defendant was not placed under arrest until after he had made a confession. There has been no showing that the trial judge applied an incorrect analysis in making that determination.

### B. Motion to Suppress Statements

Defendant claims that his confession was tainted by an illegal arrest. Because we have found that defendant's arrest was not illegal, we need not consider whether defendant's confession was sufficiently removed from the taint of an illegal arrest. Defendant further claims that he did not knowingly and voluntarily waive his constitutional rights prior to his alleged confession. Defendant sets forth two bases for this claim.

First, defendant claims that he misunderstood the effect of signing the written waiver form prior to his polygraph examination. Defendant claims he thought the form only pertained to the polygraph examination.

Before defendant signed the written waiver, Sergeant Garrity read each right contained therein and asked if defendant understood that right. Defendant indicated that he understood each right. The *Miranda* warnings given by Garrity were sufficient to apprise defendant of his constitutional rights. We reject defendant's argument that any "misunderstanding" involved with signing the written form limited the effectiveness of the *Miranda* warnings given to defendant prior to his polygraph examination.

In addition to the *Miranda* warnings given to defendant prior to his polygraph examination, defendant was given *Miranda* warnings during his first interview at

Area 2. Once an accused is advised of the *Miranda* warnings and acknowledges his understanding of them, the voluntariness of subsequent statements is not compromised by failure to repeat the warnings at each successive interview. (*People v. Hill* (1968), 39 Ill. 2d 125, 131-32.) Defendant was given *Miranda* warnings twice prior to his confession to Garrity. Each time defendant was given his *Miranda* warnings, he indicated that he understood them. Clearly, the police's conduct was sufficient to apprise defendant of his constitutional rights. We find, therefore, that the trial court did not err in finding that defendant's waiver of his *Miranda* rights was voluntary.

Defendant next claims that his alleged confessions were involuntary because they were procured through physical and verbal abuse. The day after his confession, photographs were taken of defendant showing scrapes on his wrists and a small bruise in the middle of his chest. Defendant claims these injuries were caused by the police's use of physical abuse during defendant's interrogation.

"[W]hen it is evident that a defendant has been injured while in police custody, the State must show, by clear and convincing evidence, that the injuries were not inflicted as a means of producing the confession." (*People v. Wilson* (1987), 116 Ill. 2d 29, 40.) Detective Dwyer testified that he observed defendant tugging at his handcuffs while defendant was waiting to speak with an assistant State's Attorney. This testimony was corroborated by the assistant State's Attorney. We believe the State has shown by clear and convincing evidence that the injuries to defendant's wrists were self-inflicted.

It is not known how defendant's chest was bruised. The defendant, however, has not shown that this injury occurred while he was in police custody. In *Wilson,* there

was testimony by the police that defendant did not have any significant injuries at the time of his arrest. There was also medical testimony that Wilson's injuries had occurred after his arrest. In the present case, there was no testimony or medical evidence that defendant did not have the bruise on his chest prior to his arrest. Because there was no evidence showing that defendant's chest bruise occurred while he was in custody, the burden did not shift to the State to "show, by clear and convincing evidence, that the injuries were not inflicted as a means of producing the confession."

It is the function of the judge at the suppression hearing to determine the credibility of the witnesses and to resolve conflicts in their testimony. (*People v. Redd* (1990), 135 Ill. 2d 252, 289.) While defendant claims to have been beaten and kicked numerous times during his interrogation by the police, the only injuries present on the defendant the next day were a small bruise in the middle of his chest and "scrapes" around his wrists. There was testimony that the injury to defendant's wrist was self-inflicted, and all the police officers involved in the alleged brutality denied any abuse took place. Further, defendant's injuries were not commensurate with his alleged beatings. We do not believe the trial judge abused his discretion in denying defendant's motion to suppress statements.

## II. Impaneling the Jury

### A. Challenges for Cause

Defendant claims that the trial court made disparate rulings on challenges for cause made by the State and the defense. Defendant alleges that these rulings caused defendant to use 2 of its 14 peremptory challenges. Defendant eventually used all of his peremptory challenges, and his motion for additional peremptory challenges was denied.

The defendant first points to the *voir dire* of Gail Porter, whom the court dismissed for cause on a motion by the State. Before being dismissed, Porter stated that she might believe the testimony of policemen or firemen "a little bit more" than the testimony of other witnesses. Porter also stated that she did not know if she could sign a guilty verdict because she did not think it was her responsibility to "judge someone's fate."

Defendant next claims that the trial court denied his challenges for cause to June Deacan and Susan Wisniewski although they made comments similar to Porter's. June Deacan stated during *voir dire* that she might be influenced if a witness was a policeman. Deacan explained that she was brought up to believe the police. When asked if she would believe a police officer's testimony more or less than the testimony of any other person, Deacan stated that she would try to treat policemen like any other witnesses. When the trial court denied his challenge for cause, defendant used a peremptory challenge to excuse Deacan. Susan Wisniewski stated that she "guessed" she could treat a police officer the same as any other witness, but she explained that she had a family vacation planned in approximately two weeks. Defendant claimed that a conflict between Wisniewski's vacation and the trial could impair her partiality, but this reasoning was rejected by the court. Defendant then sought to excuse Wisniewski for cause based on her response that she "guessed" she could treat police officers like other witnesses. The trial court denied defendant's challenge for cause, and defendant exercised a peremptory challenge.

In addition to saying that she might accord the testimony of police officers more weight than the testimony of other witnesses, Gail Porter stated that because she did not think it was her responsibility to judge another's fate, she did not know if she could sign

a guilty verdict form. Neither of these comments was tempered or recanted by later statements. Porter's expressed reservation concerning her ability to judge another person by signing a guilty verdict made her removal for cause proper. June Deacan stated that she would try to follow applicable law, and Susan Wisniewski stated that she guessed she could follow applicable law. Unlike Porter, neither Deacan nor Wisniewski expressed reservation concerning her ability to follow the law, and we do not believe it was error for the trial judge to deny motions to dismiss these jurors for cause.

An equivocal response by a prospective juror does not necessitate striking the prospective juror for cause where the prospective juror later states that he will try to disregard his bias. (See *People v. Tipton* (1991), 222 Ill. App. 3d 657, 664 (prospective juror stating she would try to disregard her bias was not struck for cause).) Neither does a scheduling conflict preclude a prospective juror from service where the juror's comments do not indicate that the conflict will cause bias. See *People v. McGhee* (1992), 238 Ill. App. 3d 864 (time constraints of prospective juror did not necessitate his removal for cause).

### B. Defendant's Motion for Additional Peremptory Challenges

After defendant had exhausted all his peremptory challenges, he moved for additional peremptory challenges. The trial judge denied this motion. Defendant contends that this denial was an abuse of discretion.

Reasonable limits on the right of peremptory challenge, including a maximum number of peremptory challenges, are necessary if the judicial process is to function effectively. (*People v. Moss* (1985), 108 Ill. 2d 270.) Supreme Court Rule 434(d) (134 Ill. 2d R. 434(d)) establishes the number of peremptory challenges that

the parties may normally use in criminal cases. Rule 434(d) does not grant the trial judge discretion to allow additional peremptory challenges.

The trial judge noted that both sides had taken care in the use of their peremptory challenges. He determined that there was no viable reason for allowing additional peremptory challenges. Nothing in the record suggests that defendant required additional peremptory challenges to assure an impartial jury. Because we believe that additional peremptory challenges were not necessary, we need not consider here whether trial judges have discretion to grant peremptory challenges in addition to those provided by rule.

### C. Additional Voir Dire of Prospective Juror Noel

Defendant contends that it was an abuse of discretion to reopen the *voir dire* examination of prospective juror Frenchie Lamar Noel. After the examination of several prospective jurors, including Noel, in open court, the court and counsel adjourned to chambers to discuss challenges for cause and peremptory challenges. The State moved to dismiss Noel for cause based on two separate grounds. First, the State noted that Noel indicated that he had been "jumped by police" and wrongfully charged with a crime. Although the charges were eventually dropped, Noel stated that he believed the court system had been unfair to him. Next, the State claimed that during his initial *voir dire* examination, Noel had been equivocal in his responses to *Witherspoon* questions.

During the in-chambers conference, the trial judge noted that he had omitted the question of whether Noel would accept the testimony of police officers the same as any other witness. The trial judge explained that he omitted this question because, based on Noel's claim of prior police misconduct, he was afraid Noel's answer would taint the rest of the venire.

In response to the State's motion and based on his explanation for the omitted questions, the trial judge asked that Noel be brought into chambers for further questioning. On his further examination, Noel was asked to explain in detail his prior incident with the police. After doing so, Noel stated that he would treat the testimony of police officer witnesses the same as the testimony of any other witness. Noel was further asked to clarify his position regarding the death penalty. After several answers that the trial judge characterized as "evasive," Noel stated that he would not consider the death penalty under any circumstances. The trial judge then struck Noel for cause. The defense argues that the trial judge erred in further examining Noel in chambers after the initial *voir dire* in open court.

There was evidence in the present case that Noel may have been prejudiced. Noel's repeated references to being "jumped" by police officers was evidence that Noel did not trust police officers, and he might treat them differently than other witnesses. Additionally, Noel's equivocal responses to the *Witherspoon* questioning made his impartiality respecting the death penalty suspect.

Noel had not yet been sworn, nor had the attorneys accepted him as a juror. The trial judge admittedly did not subject Noel to the full range of *voir dire* questioning because he was afraid that Noel's answers would taint the rest of the venire. Noel's *voir dire* had not yet been completed, and the initial portion of his *voir dire* raised serious questions as to his ability to properly perform the duties of a juror. Under these circumstances, it was not error to ask additional questions of Noel in chambers out of the hearing of the rest of the venire.

### D. Voir Dire and Service of Juror Matthew Evans

Defendant claims that during *voir dire*, Matthew

Evans did not fully divulge what could have been a bias in favor of the State. During trial, it came to defense counsel's attention that Evans was the friend of a judge, and that Evans' father-in-law had been an investigator for the Cook County State's Attorney. Defendant contends that Evans failed to disclose this information when asked. At the close of evidence, the defense moved to reopen the *voir dire* of Evans, to exclude Evans and for a mistrial. The trial court denied these motions.

Prior to trial, the trial judge spoke to the entire venire and asked the following questions:

"THE COURT: Do any of you—this is a two part question. Do any of you know any Assistant State's Attorneys, Public Defenders or judges? Okay. Now, the second part of that question. The fact that you may know an Assistant State's Attorney, or Public Defender, or a judge, would this in any way prevent you from being fair and impartial?

In other words, all we are asking you to do is listen to the evidence, and based on that evidence and the law, come up with a fair and impartial verdict. Would the fact that you may know one of these people, would that in any way affect your ability to do so?

(No response.)

THE COURT: Okay. No problem there."

Defendant contends that Evans failed to disclose that he was a friend of a judge in response to the above question. The record does not disclose which members of the venire, if any, indicated in response to the question that they knew an assistant State's Attorney, public defender or a judge. The defendant, therefore, has not established that Evans failed to answer the question in the affirmative.

In any event, Evans indicated during *voir dire* that he was a police officer in the Chicago suburb of Westchester. Evans candidly admitted knowing numerous policemen and attorneys. In response to the trial judge's inquiry into whether he knew any State's Attorneys,

Evans indicated that he knew a former State's Attorney, who was a judge at the time of trial, and a State's Attorney from the Fourth District. Evans stated that he did not believe there was any reason that he could not be impartial in this case.

Where neither party has exercised a peremptory challenge against a potential juror, the decision whether to accept the potential juror as an impartial trier of fact is discretionary with the trial judge. (*People v. Taylor* (1984), 101 Ill. 2d 377, 386-87.) In the present case, we do not believe that the additional information regarding Evans' association with a judge or his father-in-law's position with the Cook County State's Attorney put Evans' impartiality in question. There is no evidence in the record that Evans withheld any information that the trial court asked him to disclose. Evans freely admitted that he was acquainted with a State's Attorney and a judge. Defendant fails to explain how Evans' friendship with an additional judge could impair his impartiality or offer defendant further information with which to test the potential juror for bias. Further, due to Evans' friendships and strong ties to law enforcement, the occupation of his father-in-law does little to add to Evans' apparent knowledge of the criminal judicial system. Based on the similarities between the information disclosed by Evans and that discovered by defendant, it was not an abuse of discretion to deny defendant's motion to reopen the *voir dire* examination of Evans.

Defendant also claims that the State exploited Evans' background as a policeman to bring to the attention of the jury the fact that defendant was given a polygraph examination. Defendant contends that this alleged exploitation was in violation of an *in limine* order. No specific mention of defendant's polygraph examination was made during trial. Defendant, however, claims that the testimony of Sergeant Patrick Garrity, the

officer who administered the polygraph examination, was designed to let Evans know that defendant took a polygraph examination. Garrity testified that he worked in the police department's crime lab, and that defendant was brought to him for questioning. Garrity testified that prior to the interrogation, defendant signed a written waiver of his *Miranda* rights. Garrity stated that he then asked defendant about his background, how he was feeling, whether he was taking any medication, and whether he had consumed any alcohol. Defendant claims these questions had no relevance to the case, and could only be designed to inform Evans that Garrity gave defendant a polygraph examination. Defendant, however, failed to object to the testimony at trial, and has therefore waived the issue on appeal. *People v. Shum* (1987), 117 Ill. 2d 317, 340.

### III. Ineffective Assistance of Counsel

Defendant claims that defense counsel provided ineffective assistance in several respects. First, defendant claims that counsel provided ineffective assistance by allowing Matthew Evans to sit on the jury. Next, defendant claims that defense counsel provided ineffective assistance by failing to file a motion to discharge the venire. Finally, defendant claims that counsel was ineffective for failing to secure the presence of a material witness.

In order to establish an ineffective-assistance-of-counsel claim, the defendant has the burden of showing (1) that "counsel's performance was deficient" in that it "fell below an objective standard of reasonableness," and (2) that the "deficient performance prejudiced the defense" such that the defendant was deprived of a fair trial whose result was reliable. *Strickland v. Washington* (1984), 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

## A. Allowing Evans to Sit on the Jury

During *voir dire*, defense counsel failed to challenge Matthew Evans, a police officer, for cause or to exercise a peremptory challenge against Evans. Defendant characterizes this decision as "incredible." Defendant alleges that Evans' status as a police officer could have created a bias in favor of the police witnesses who testified for the State. Evans, however, stated during *voir dire* that he could treat police witnesses the same as any other witnesses. Evans was also a suburban police officer. The officers who testified for the State served in Chicago. Defense counsel exercised a peremptory challenge against Lamar Minor, the only potential juror questioned who was a Chicago police officer, showing that defense counsel distinguished between the two prospective jurors. As a preliminary matter, defendant would have us adopt the position that the defense's acceptance of a police officer as a juror in any case, without more, constitutes ineffective assistance of counsel. We cannot accept this point.

Defendant also asserts that defense counsel should have peremptorily challenged Evans because Evans would be able to discern, based on the testimony of Garrity, that defendant took a polygraph examination. Defendant argues that it was the State's improper conduct which alerted Evans to the fact that defendant was given a polygraph examination. Ineffective assistance is judged at the time of the attorney's conduct. (*Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) Defense counsel could not anticipate improper conduct by the State. Even if we were to accept defendant's interpretation of the facts, therefore, defense counsel would not have been ineffective for failing to excuse Evans on this ground at the time the jury was chosen.

## B. Failure to File a Motion to Discharge the Venire

Defendant contends that the pool of potential jurors contained a disproportionately low number of blacks. Of 114 venire persons, defendant alleges that only 16 were black. Defendant claims that trial counsel was ineffective for not filing a motion to discharge the venire on this ground.

"Any objection to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel prior to the voir dire examination. For good cause shown the court may entertain the motion after voir dire has begun but such motion shall not be heard after a jury has been sworn to hear the cause." Ill. Rev. Stat. 1989, ch. 38, par. 114—3(a).

Defense counsel questioned the number of blacks in the venire at the time of trial, but not until after the jury had been selected and sworn. In response, the trial judge stated:

"There weren't that many blacks on the venire but the State—the defense could have brought that up earlier. Maybe we would have worked something out."

Defendant contends that the disproportionately low number of blacks on the venire violated the fair-cross-section requirement as enunciated in *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692. Defendant asserts that if defense counsel had raised this issue within the time period prescribed by section 114—3, the trial judge would have ordered a new venire.

"[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." (*Taylor*, 419 U.S. at 527, 42 L. Ed. 2d at 696, 95 S. Ct. at 696.) In order to establish a *prima facie* violation of the fair-cross-section requirement, the defendant must show: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the

number of such persons in the community; and (3) the under-representation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri* (1979), 439 U.S. 357, 364, 58 L. Ed. 2d 579, 586-87, 99 S. Ct. 664, 668.

Defendant has not established a violation of the fair-cross-section requirement. Defendant's allegations relate to the composition of an isolated venire of 114 potential jurors. The fair-cross-section requirement deals with the method of selecting jurors from all eligible citizens. Defendant has not shown that the low number of blacks on the venire from which his jury was chosen resulted from anything other than pure chance. This is insufficient to show a violation of the fair-cross-section requirement.

Defendant claims that even if the fair-cross-section requirement was not violated, the trial judge's comments show that defense counsel's failure to raise the issue prejudiced defendant. This claim is without merit. As discussed above, defendant has failed to show that the venire from which his jury was chosen was constitutionally deficient. An attorney's conduct does not fall below the range of "reasonable professional assistance" under *Strickland* (466 U.S. at 688-89, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065-66) by failing to make an argument that has no legal basis.

*C. Failure to Secure the Presence of a Material Witness*

Defendant claims that trial counsel provided ineffective assistance by failing to secure the presence of Angela McDaniels as a witness on defendant's behalf. The decision whether to call particular witnesses is generally a matter of trial strategy. (*People v. Jones* (1993), 155 Ill. 2d 357, 369.) A decision which involves a matter of trial strategy will generally not support a claim of ineffective representation. *People v. Flores* (1989), 128 Ill. 2d 66, 106.

During a motion to suppress, defense counsel learned that the police had interviewed McDaniels. McDaniels stated to police that she knew nothing about the origin of the fire, but that defendant had recently attempted to reconcile with her. Defendant proposed that McDaniels move in with defendant and his family. McDaniels refused and told defendant that he had to choose between her and his wife. This testimony from McDaniels would have been harmful to defendant's case. Defendant does not explain what positive effect, if any, McDaniels' testimony could have had. Under these circumstances, it was not ineffective assistance of counsel to fail to procure McDaniels as a witness on defendant's behalf.

## IV. Trial Errors

### A. *Failure by State to Disclose Fingerprint Evidence*

Defendant contends that the State withheld evidence in violation of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and our Rule 412 (134 Ill. 2d R. 412). Defendant requested the State to "supply any report and results of any and all scientific test, \*\*\* including such tests as \*\*\* fingerprints." The State did not provide defendant with any fingerprint reports.

At trial, Detective Paladino, a witness for the State, testified that the gasoline can he found in apartment 206 was sent to the crime lab for fingerprint analysis. Additionally, Paladino testified that he believed the black powder visible on the can at trial was fingerprint powder. Based on Paladino's testimony, defendant moved for a mistrial. The prosecutor denied the existence of a fingerprint report, and opened his file to defendant. No fingerprint report was found, and the trial court denied defendant's motion for a mistrial.

In *Brady,* the Court held "that the suppression by

the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97.

In the present case, the contents of the fingerprint report, assuming a fingerprint report ever existed, are unknown. In order to determine materiality under *Brady*, it is necessary to consider the content of the undisclosed evidence and its effect upon defendant's guilt or punishment. The *Brady* analysis is ill-suited for situations where evidence has been lost or destroyed and its contents are unknown. Additionally, the sanction normally imposed under *Brady*, a remand for a new trial, would be ineffective in this type of situation. The undisclosed evidence would not be available at a second trial. We do not believe, therefore, that *Brady* controls here.

The present case is similar to *Arizona v. Youngblood* (1988), 488 U.S. 51, 58, 102 L. Ed. 2d 281, 289, 109 S. Ct. 333, 337, where the Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." The underlying policy concerns of *Youngblood* are analogous to those in the present case. In order to promote the preservation of exculpatory evidence, there must be the possibility of a sanction where evidence is lost or destroyed. On the other hand, a defendant should not be rewarded for the inadvertent loss of a piece of evidence where other evidence sufficient to support his conviction remains. The proper balance between these competing interests can be accomplished through careful consideration of (1) the degree of negligence or bad faith by the State in losing the evidence, and (2) the importance of the lost evidence relative to the evidence presented against the defendant at trial.

We believe that imposing sanctions against the State here would be inappropriate. First, defendant has failed to show any bad faith on the part of the State. More importantly, there was independent evidence tying defendant to the gasoline can. Two witnesses identified defendant as filing a gasoline can prior to the fire, and a can similar to that described by the witnesses was discovered as a result of information gained from defendant's confession. There is also overwhelming evidence of defendant's guilt separate from the gasoline can.

Defendant next claims that the State's withholding of the fingerprint report violated our Supreme Court Rule 412 (134 Ill. 2d R. 412). Rule 412 deals with material or information that is within the possession or control of the State. As discussed above, it is not clear that a fingerprint report ever existed. However, even if we assume that a fingerprint report did exist at one time, it has now been lost. The prosecutor stated that he had never seen a fingerprint report. The State opened its entire file to defendant, and the fingerprint report was never found. Defendant has not shown that the fingerprint report was in the possession or control of the State, or available to it. The State, therefore, could not have an obligation to disclose the report under Rule 412.

### B. Cross-Examination of Andre Council

Defendant claims the trial court erred in not permitting defense counsel to question prosecution witness Andre Council in connection with an alleged arson arrest in March 1987. On cross-examination, defense counsel asked Council if it were true that he had been arrested for arson in March 1987. The State objected and a conference was held in chambers. A police report was produced that indicated Council had been questioned concerning an arson on March 17, 1987. Council was released the same day due to insufficient evidence, and he was never charged with the crime.

The latitude to be allowed on cross-examination and rebuttal is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 441-42; *People v. Collins* (1985), 106 Ill. 2d 237, 269; *People v. Peter* (1973), 55 Ill. 2d 443, 451-52.) We do not believe the trial court abused its discretion here.

Defendant states that Council was present near the scene of the fire both before and after the fire. Defendant contends that the combination of Council's proximity to the scene of the fire and his having been questioned in a different arson investigation on some prior occasion somehow affects his credibility here. Defendant, however, does not explain how Council's credibility would be affected. We do not see how the facts put forth by defendant bring Council's credibility into question. We reject, therefore, defendant's contention.

### C. Opinion Testimony

Defendant claims the trial court erred in allowing improper lay opinion testimony by Peter O'Sullivan and Thomas Sullivan, the paramedics who transported defendant to the hospital. When asked how defendant first appeared to him, Peter O'Sullivan testified that defendant appeared kind of strange, not like he was really "remorseful." O'Sullivan later testified that when a person has been a paramedic for some time, he begins to understand the way people react to certain situations. Thomas Sullivan testified that on the way to the hospital defendant discussed his job, but not his wife and child. Sullivan characterized this conduct as unusual.

Defense counsel failed to object to the testimony of Peter O'Sullivan during trial. Any objection to that testimony, therefore, has been waived in this appeal. (*People v. Shum* (1987), 117 Ill. 2d 317, 340; *People v. Collins* (1985), 106 Ill. 2d 237, 263; *People v. Stewart*

(1984), 104 Ill. 2d 463, 488.) Defendant contends that we should nevertheless consider this testimony under the plain error doctrine. The plain error doctrine provides that a court of review may notice waived errors if the evidence is closely balanced or the error is so fundamental and of such magnitude that the accused was denied a fair trial and remedying the error is necessary to preserve the integrity of the judicial process. (*People v. Henderson* (1990), 142 Ill. 2d 258, 311.) There is overwhelming evidence in the present case against defendant, and we do not believe the error, if any, involved in admitting the opinion testimony of Peter O'Sullivan denied defendant a fair trial. Accordingly, we decline to review the testimony under the plain error doctrine.

Unlike the testimony of Peter O'Sullivan, defendant did object to the testimony of Thomas Sullivan. Sullivan testified that on the way to the hospital defendant discussed his job, but not his wife and child. Sullivan characterized this conduct as "unusual." Defense counsel's objection to this testimony was overruled by the trial court. Generally, a witness may only testify to facts within his own personal knowledge and recollection, and may not draw inferences and conclusions. *People v. Enis* (1990), 139 Ill. 2d 264, 294-95.

The State failed to lay a proper foundation for Thomas Sullivan's testimony as to whether defendant's conduct was normal. Even if the State had laid a proper foundation, however, it was not necessary for the jury to hear Sullivan's opinion. Sullivan testified that his opinion was based upon defendant's topic of conversation in the back of the ambulance. The jury was familiar with the circumstances preceding defendant's ambulance ride, and it was capable of determining whether defendant's topic of conversation was unusual. It was improper, therefore, for the trial judge to overrule defendant's objection to Sullivan's opinion testimony.

Given the overwhelming evidence against defendant and the relative insignificance of this portion of Sullivan's testimony, however, we believe the trial court's failure to sustain defendant's objection was harmless error.

### D. Evidence of Allegations of Prior Police Brutality

Defendant testified that he was physically abused and racially harassed by Detectives Dwyer and Lotito during his interrogations. Defendant wanted to introduce the testimony of other persons who had filed complaints with the office of professional standards against Dwyer. The State filed a motion *in limine* to exclude testimony regarding prior alleged abuse by Dwyer, and after a hearing, the trial court granted the motion.

Defendant requested that he be allowed to introduce evidence of three persons who were allegedly abused by Dwyer. At the resulting hearing on the State's motion *in limine*, Ms. Tomsek alleged that Dwyer pushed her and pressed his thumbs against her throat. Dwyer claimed that Tomsek was so intoxicated that she could not be interviewed and was placed in a room to "sleep it off." Mr. Lawson complained that police were belligerent, but made no claim of any physical abuse. Defendant also requested that Stanley Howard be allowed to testify. In 1984, Howard filed a complaint that Dwyer had beat him around the face and head, punched him six times, kicked him in the stomach, and beat him in the ribs and ankles.

In support of his argument that the trial court erred in excluding the testimony of Tomsek, Lawson and Howard, defendant cites *People v. Banks* (1989), 192 Ill. App. 3d 986. In *Banks*, the appellate court held that the trial court erred in excluding evidence of prior abuse by the officers who arrested Banks. A doctor testified that

Banks sustained multiple bruises and scrapes as the result of trauma with a blunt instrument. Banks claimed he had been beaten by the police with a flashlight. Banks sought to introduce evidence that 13 months prior to the incident, another person was allegedly beaten by the same officers in a similar manner and sustained comparable injuries.

In *Banks*, the court relied on three elements in admitting evidence regarding prior allegations of police brutality: (1) the prior allegations of police brutality were not unduly remote; (2) the prior allegations of police brutality were against the same officer, and they were similar to the allegations put forth by the defendant; and (3) in both the prior allegations of abuse and the case before the court, there was evidence of injury consistent with police brutality. We believe the present case is distinguishable from *Banks*. The allegations of Tomsek and Lawson are dissimilar to the allegations of defendant, and therefore, those allegations are not relevant to the present case. The trial judge stated that Howard's allegations of police misconduct by Dwyer were similar to the defendant's allegations in the present case. The alleged abuse of Howard, however, took place approximately three years prior to defendant's arrest. Hence, the alleged abuse was much more remote than in *Banks*. Further, there was no evidence that either Howard or defendant sustained injuries consistent with their claims of police brutality. We do not believe, therefore, that the trial court erred by excluding Howard's allegations of prior abuse.

### E. Expert Opinion as to Location of Gasoline Can

Defendant contends that the testimony of his expert witness, John Campbell, was unduly limited by the trial court. After Campbell had given his opinion on how the fire had started and progressed, defense counsel showed

Campbell a photograph of the gasoline can found in apartment 206. Defense counsel then showed Campbell a photograph of the second-floor hallway as it appeared after the fire and asked if the gasoline can could have been located in the hallway during the fire. The State's objection to this question was sustained. During a sidebar, defense counsel made an offer of proof that Campbell would have testified that it was not possible that the gasoline can was located in the second-floor hallway during the fire.

Campbell's expert opinion was not necessary to facilitate the jury's understanding of the facts in this case. Defense counsel was allowed to establish through the testimony of Campbell that if the gasoline can was directly subjected to the fire, only part of the can would remain. The can was admitted into evidence, and the jury was given the opportunity to observe that it was not severely damaged. Photographs of the second-floor hallway were also admitted into evidence. We do not believe that the trial court abused its discretion in limiting Campbell's testimony.

### F. Guilt Beyond a Reasonable Doubt

Defendant claims that he was not proven guilty beyond a reasonable doubt because the identification testimony of Council and Stewart, as well as his alleged confession, was unreliable. The test of whether a defendant has been proven guilty beyond a reasonable doubt is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Young* (1989), 128 Ill. 2d 1, 49.

Defendant first claims that he was not proven guilty beyond a reasonable doubt because the eyewitness identification of defendant buying gasoline is unreliable.

Defendant asserts that the testimony of a single eyewitness may be sufficient to sustain a conviction, but claims that the eyewitness' account must have several indicia of reliability to warrant such a result. (See *People v. Patrick* (1990), 205 Ill. App. 3d 222, 226; *People v. Kidd* (1989), 180 Ill. App. 3d 1065, 1070; *People v. Dean* (1987), 156 Ill. App. 3d 344, 351.) We need not consider the indicia-of-reliability test here because the State presented more evidence than the testimony of a single eyewitness to procure defendant's conviction. In the present case, two eyewitnesses identified defendant purchasing gasoline. Additionally, the eyewitness identification was merely part of the substantial amount of evidence implicating defendant in the present case. The jury was able to consider any weaknesses in the eyewitness identification of defendant and adjust the weight to be given that evidence accordingly.

Defendant further claims that he was not proven guilty beyond a reasonable doubt because the State's evidence that he confessed to setting the fire is unreliable. Defendant points to the lack of any audio or video recordings of his confessions as evidence that the confessions never took place. The officers involved in defendant's interrogation testified that defendant confessed to the setting the fire on two separate occasions—first to Sergeant Garrity and next to Detective Dwyer. In addition to the officer's testimony that defendant confessed to setting the fire, the confessions were consistent with one another, and they were also consistent with the physical evidence gathered at the scene of the fire. Also, defendant's confession led the police to the gasoline can, an additional piece of evidence which the police had not found prior to the confession.

There was overwhelming evidence implicating defendant presented at trial. Viewing the evidence in the light most favorable to the prosecution, there was

sufficient evidence on which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

## V. Sentencing Errors

### A. Victim Impact Evidence

Defendant contends that improper victim impact evidence was presented at trial and during sentencing. During the State's case in chief at the guilt phase of defendant's trial, several witnesses testified to improper victim impact evidence. Ollie May Dodds testified that her daughter, Johnnie Dodds, who died in the fire, had been a nurse in the army and at the time of the fire was a counselor for Alcoholics Anonymous. Defense counsel's objection to this testimony was sustained. Debra McFadden, the sister of Robert Stevens, who also died in the fire, testified that Robert worked as a mental health counselor for various organizations and that he had two sons at the time of the fire. Defense objection to this testimony was also sustained.

Evidence concerning the background or family of a murder victim constitutes reversible error when it appears to have been presented by the prosecution in such a way as is calculated to give the jury the impression that it is relevant and material evidence on the question of defendant's guilt or innocence. (*People v. Hayes* (1990), 139 Ill. 2d 89, 141; *People v. Barrow* (1989), 133 Ill. 2d 226, 274-75.) These incidences of improper victim impact evidence were brief and isolated. The prosecutor did not dwell on the subject in such a way that the jury would understand this evidence was material to defendant's guilt or innocence. In any event, the prompt sustaining of an objection by a trial judge is ordinarily sufficient to cure any error in a question or answer before the jury. (*People v. Howard* (1991), 147 Ill. 2d 103, 149; *People v. Baptist* (1979), 76 Ill. 2d 19, 30.)

Accordingly, the limited victim impact evidence that reached the jury during trial does not warrant reversal.

Regarding defendant's claim that the State improperly admitted victim impact during the sentencing phase of defendant's trial, this claim was rejected in *Howard*:

"In *Payne* [*v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597,] the Court declared that 'a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.' (*Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608.) We agree with the Court that such evidence is relevant to a consideration of the appropriate punishment for a capital defendant. Accordingly, we now choose to align ourselves with the Court rule on this subject." (*Howard*, 147 Ill. 2d at 158.)

Defendant has not persuaded us to depart from our reasoning in *Howard*.

### B. Morgue Photographs

Defendant contends that the admission of morgue photographs at the guilt phase of trial and at sentencing was prejudicial error. The photographs depicted the bodies of victims Johnnie Mae Dodds and Robert Stevens.

Defendant claims that the photographs should not have been admitted at the guilt phase of defendant's trial because the cause of death or identity of the victims was not contested. This claim is without merit. When a defendant in a murder trial pleads not guilty, the prosecution is allowed to prove every element of the crime charged and every relevant fact, even if the defendant offers to stipulate to those same facts. (*People v. Henderson* (1990), 142 Ill. 2d 258, 319.) Absent some other valid objection, therefore, the photos were admissible to establish the cause of death and the identity of the victims.

Defendant next claims the photographs were unduly

gruesome, and that they were likely to inflame the jurors' passions. "If photographs are relevant to prove facts at issue, they are admissible and can be shown to the jury unless their nature is so prejudicial and so likely to inflame the jurors' passions that their probativeness is outweighed." *(Henderson,* 142 Ill. 2d at 319.) It is the function of the trial court to weigh the probative value and potential prejudicial effect of photographic evidence, and the decision of the court will not be reversed absent an abuse of discretion. *(People v. Redd* (1990), 135 Ill. 2d 252, 320.) The trial judge ruled that the photographs were not unduly prejudicial and allowed their admission. The photographs are not included in the record, and therefore, we are unable to say that the trial judge abused his discretion in allowing their admission.

Defendant also claims that it was error to allow the photographs to be resubmitted to the jury during the death penalty phase of his trial, and that defense counsel was ineffective under *Strickland,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, for failing to object to this resubmission. At the death penalty hearing, the nature of the crime and the character of the accused are considered. *(People v. Salazar* (1988), 126 Ill. 2d 424, 467.) Although the photographs may be disturbing, the jury had already seen the photographs during the guilt phase of trial and the photographs were an accurate representation of the result of defendant's crime. Allowing the jury to see how the victims died was relevant to the nature of the crime. (See *People v. Franklin* (1990), 135 Ill. 2d 78, 110 (it was not error to submit, during the second phase of a death penalty hearing, three color photographs depicting the body of the victim at the murder scene because the photographs were probative of the violent nature of the criminal act and were corroborative of the trial testimony).) Because the

photographs were properly resubmitted during defendant's death penalty hearing, it could not be ineffective assistance for defense counsel to fail to object to their resubmission.

## C. Death Penalty Hearing Instructions

Defendant claims that he was denied the right to a fair sentencing hearing because the trial court failed to instruct the jury during the eligibility phase that the only alternative to the death sentence is natural life imprisonment without the possibility of parole. This court considered and rejected this argument in *People v. Lear* (1991), 143 Ill. 3d 138, 151, and we decline to reconsider that holding here.

## D. Death Penalty Hearing Arguments

Defendant claims that the prosecutor repeatedly made improper arguments and misstated the law during defendant's sentencing hearing. Defendant asserts, therefore, that this cause should be remanded for a new sentencing hearing.

Defendant first notes several instances where the prosecutor allegedly misstated the law. During the mitigation phase of sentencing, the prosecutor stated that "the fact that the defendant has no prior convictions is not mitigating because of the nature and the severity of the crime." Defense counsel's objection to this comment was sustained. The prosecutor then stated that "the defendant's work history, his education background, belief in God, helping others in doing good deeds" are "not mitigating." The trial court again sustained defense counsel's objection, and instructed the jury that those factors are mitigating under the law.

"In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety and the complained-of comments must be placed in their proper

context." (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76.) Just prior to stating that the various acts of defendant "were not mitigating," the prosecutor stated that the mitigating factors presented by the defense were not sufficiently mitigating to preclude imposition of the death penalty. Additionally, after the trial judge stated that defendant's evidence was mitigating under the law, the prosecutor responded to the jury, "I say to you that it is not mitigation sufficient to preclude imposition of the death penalty." The context in which the prosecutor's comments were made shows that by "not mitigating," the prosecutor meant "not sufficiently mitigating under the circumstances of this case." The comments by the judge and the prosecutor would have made this distinction evident to the jury.

Defendant also claims that the prosecutor's statement during rebuttal that "if [defendant's] good outweighs the bad that you know about, then you should let him go," was a misstatement of the law. Defense counsel's objection to this statement was overruled. Defendant claims that the good does not have to outweigh the bad, but that the good need only be sufficient to militate against the imposition of death. We agree. We do not, however, believe that this misstatement warrants remanding this cause for a new sentencing hearing. At the conclusion of the hearing, the jury was correctly instructed as to the applicable law. The instructions explained that defendant could be sentenced to death only if the jury could unanimously find that there were no mitigating factors sufficient to preclude imposition of the death penalty. We do not believe that, given the instruction provided to the jury prior to its deliberation, the isolated comment by the prosecutor prejudiced defendant. Accordingly, the misstatement of law by the prosecutor was harmless error.

Defendant next asserts that the prosecutor improp-

erly implied that defendant would commit violent acts in the future if not put to death. During his final argument, the prosecutor stated that "it would be unfair for me to predict that he will set fire to a mattress and kill seven inmates as it would be for them to say he won't. We can't predict the future, so don't you try." "[C]ommenting that the defendant may kill while in prison may cause the jury to focus 'upon a speculative possibility that may or may not occur,' and that is immaterial to the jury's consideration of aggravating and mitigating factors." (*People v. Hooper* (1989), 133 Ill. 2d 469, 500, quoting *People v. Walker* (1982), 91 Ill. 2d 502, 515.) Comments which are invited by opposing counsel, however, are generally appropriate. (*United States v. Young* (1985), 470 U.S. 1, 12, 84 L. Ed. 2d 1, 10-11, 105 S. Ct. 1038, 1044-45; *People v. Howard* (1991), 147 Ill. 2d 103.) In the present case, the prosecutor's comment was in direct response to an argument made by defense counsel in his closing argument. Defense counsel claimed that defendant's outbreak of violence was an isolated instance brought on by a special set of circumstances which would not occur again. In response to this argument, the prosecutor stated that neither he nor defense counsel should engage in such speculation. We believe that the prosecutor's response was invited by the argument of defense counsel, and therefore, defendant cannot claim that the response was error.

Defendant next claims that the State's closing argument served to diminish the jury's sense of responsibility regarding its role in the imposition of the death penalty. During closing argument, the prosecutor stated to the jury that "[y]ou must follow the law. And in so doing you are not killing anyone." This comment was in response to defense counsel's plea during his opening statement that the jury not return a verdict which would kill the defendant. Defense counsel was objecting

to the label put on a sentence of death. The jury would not be "killing" defendant in the same manner that defendant "killed" the victims of the fire; instead, the prosecutor was urging the jury to follow the law. While following the law might ultimately result in defendant's death, labeling the jury's action as "killing" was inappropriate. Because defense counsel invited the prosecutor's response, that response was not error.

Defendant also claims that the State misstated the evidence by arguing that defendant had a relative who would "look out" for defendant in prison. The prosecutor stated that "[defendant] has help. You heard he has relatives over in Division 6—those people are going to look out for him." One of defendant's mitigation witnesses, Jack Smith, Jr., was defendant's cousin and a correctional officer at the Cook County jail where defendant was held prior to trial. Defendant claims that he would not stay in Cook County jail if sentenced to life imprisonment, and there was no evidence that Smith would "look out" for him. As we stated earlier, comments of the prosecutor made during closing arguments must be examined in context. (*Cisewski*, 118 Ill. 2d at 175-76.) The comment regarding defendant's relative was made during the prosecutor's response to defendant's assertion that he had been well-behaved while in jail awaiting trial. The prosecutor stated that defendant's good behavior meant little because defendant knew such behavior would eventually be used as mitigating evidence in a death penalty hearing. The prosecutor then made the statement at issue. The statement referring to defendant's relative was an explanation of defendant's good behavior in prison prior to trial, it was not an attempt to convey the idea that, if sentenced to life imprisonment, defendant would be accorded special treatment.

Finally, defendant claims that the prosecutor's

characterization of defendant as a "little weasel" was error. Defense counsel's objection to this statement was sustained. Defendant claims that the prejudice he suffered as a result of this statement could not be cured by an objection, and cites *People v. Garreau* (1963), 27 Ill. 2d 388, in support of his contention. In *Garreau,* "[t]he prosecutor referred to the defendant as a pervert, a weasel and a moron; told the jury that the defendant, who raped his mother's friend, would rape a dog and would rape each and every member of the jury \*\*\*." (*Garreau*, 27 Ill. 2d at 391.) We believe *Garreau* is distinguishable from the present case. Here, the prosecutor was discussing defendant's alleged rock throwing incident with Patricia Phiefer. The prosecutor stated that instead of waiting to speak with Phiefer after he had thrown a rock through her window, the "little weasel" ran away. While this type of name calling is inappropriate, we believe that any prejudice to defendant was cured when the trial court sustained defendant's objection. *People v. Franklin* (1990), 135 Ill. 2d 78, 100.

### E. State's Rebuttal Argument

Defendant alleges that the State should not have been allowed to make a rebuttal closing argument at the second stage of the capital sentencing hearing. Defendant acknowledges that this court has held that it is proper for the State to make a rebuttal closing argument at a death sentencing hearing (*People v. Caballero* (1984), 102 Ill. 2d 23, 47-48), but asks that we now overrule the *Caballero* decision. We do not find defendant's arguments persuasive, and therefore decline to reconsider *Caballero*.

### F. Death as a Disproportionate Punishment

Defendant contends that in light of the substantial mitigating evidence, the imposition of the death penalty

was disproportionate punishment. Defendant called 27 witnesses in mitigation. These witnesses established that defendant came from a broken home, helped support his family while growing up, was generally helpful, was a good student and an excellent athlete, and was well-behaved in jail while awaiting his trial. While these mitigating factors are substantial, defendant's crime was exceptionally brutal and heinous. Because defendant could not stand to see his wife and child with another man, while he wanted to be with another woman, defendant set fire to an apartment building resulting in the deaths of his wife and son, and five innocent persons. This crime was not done in the heat of passion, but was premeditated and based on selfish motivation.

It is the function of the jury to balance all the factors in aggravation and mitigation (*People v. Gacy* (1984), 103 Ill. 2d 1, 102), and the decision of the jury will not be overturned where the record shows that its determination was reached on a logical basis (*People v. Walker* (1985), 109 Ill. 2d 484, 506). Only where there are highly unusual circumstances will a death sentence imposed following a proper hearing be disturbed on the basis that mitigating factors should have precluded its imposition. (*People v. Neal* (1985), 111 Ill. 2d 180, 200.) We do not believe that such unusual circumstances exist in the present case, and we decline to vacate defendant's sentence.

## VI. Constitutionality of the Illinois Death Penalty Statute

Defendant raises several challenges to the constitutionality of the Illinois death penalty statute. All challenges raised by defendant have been addressed previously by this court and rejected, and defendant does not persuade us to reach a different result here.

Defendant first claims that the unlimited discretion

vested in the prosecutor to request a death penalty hearing violates the eighth and fourteenth amendments. This claim was rejected in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43. Defendant next claims that the death penalty statute's requirements concerning the presentation and evaluation of mitigating evidence violate the prohibition against nondiscretionary capital sentencing. Defendant claims that if no mitigating evidence is shown, the jury is obligated to sentence defendant to death. The substance of this claim was rejected in *People v. Howard* (1991), 147 Ill. 2d 103, where this court held that the determination of the jury in a death penalty hearing is a balancing process, and no burden of proof is allocated to the prosecution or defense. Finally, defendant claims that the death penalty statute as a whole lacks adequate safeguards to prevent the arbitrary or capricious imposition of the death penalty. This court has stated that if the individual aspects of the statute are constitutional, then it follows that the whole is constitutional. (*People v. Gosier* (1991), 145 Ill. 2d 127, 165.) Defendant claims that the cumulative aspects of the statute render it arbitrary, but defendant has not shown that any individual aspect of the statute is unconstitutional.

For the reasons stated above, we reject defendant's contention that the Illinois death penalty statute is unconstitutional.

## CONCLUSION

The judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, September 21, 1994, as the date on which the sentence of death is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1992)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of

Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*