THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LIZELL BRYANT, Defendant-Appellant.

First District (4th Division)   No. 1—00—2218

Opinion filed September 28, 2001.

Rita A. Fry, Public Defender, of Chicago (Pamela Leeming, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Veronica Calderon Malavia, and Alan Spellberg, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

Following a bench trial, defendant Lizell Bryant was convicted of attempted first-degree murder and aggravated battery and sentenced to an extended term of 60 years' imprisonment. Defendant appeals his

convictions and sentence, arguing that (1) the State failed to prove beyond a reasonable doubt that defendant did not act in self-defense; (2) his right to due process was violated when the State failed to tender evidence favorable to the defense; (3) his extended-term sentence should be reduced under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); and (4) a 30-year sentence would be excessive. For the reasons that follow, we affirm defendant's conviction, but vacate his sentence and remand for resentencing.

In 1998, defendant was indicted on several charges, including attempted first-degree murder and aggravated battery. At his first trial, the jury returned a verdict of guilty of aggravated battery but was unable to render a verdict on the attempted murder count. Defendant's motion for a new trial was granted, and his second trial was a bench trial.

The following facts were adduced at his second trial. Defendant's wife, Evelyn Bryant, first testified for the State. She and defendant married in 1991 but separated in 1997. Evelyn moved out of their house and into a studio apartment in Des Plaines at 1409 East Ashland Avenue while defendant purchased a two-flat apartment in Joliet. While separated, Evelyn continued to see defendant, spending some weekends and nights with him.

On the evening of October 20, 1998, defendant arrived in Des Plaines around 10 p.m. and Evelyn allowed him into the apartment. At some point, defendant hit Evelyn on her head. She fell to the floor, where defendant sat on her back and continued beating her with his fist. He next hit her over the head several times with a vase and a brass candlestick. During this incident, defendant told her that she was going to die, that if anyone came to the door he would kill her, and he hoped she had said good-bye to her grandchildren. Evelyn tried to defend herself by covering her head with her hands and asked him why he was doing this to her, but defendant continued to hit her and at one point covered her face with pillows.

When defendant stood up and walked toward the kitchen, Evelyn ran for the door, but defendant stopped her and stabbed her twice in the chest with a kitchen knife. She grabbed the blade and tried to bend it back towards defendant. Evelyn bit defendant and defendant bit her back. She then took control of the knife and ran to the kitchen to call the police. Defendant reached the phone first, pulled it off the wall, and threw it to the floor. She screamed at defendant to leave, but he stood in front of the door and asked her why she made him do this to her. He then left and Evelyn went to a neighbor's apartment for help. When the police arrived, Evelyn told them that defendant had done this and gave them his address and a description of his car.

On cross-examination, Evelyn stated that she did not remember if the dining-room table had been turned over during the struggle and stated that she did not cut defendant. Evelyn denied knowing about a woman named Laura Williams or that defendant had a girlfriend during their separation. She recalled seeing a card at his apartment from Laura but believed defendant when he told her the card was for his son. She denied accusing defendant of having an affair with Williams and other women but agreed that her daughter had seen him with another woman.

Officers Jeff Rotkovich and Jeff Jacoby of the Des Plaines police department testified that they responded to 1409 East Ashland Avenue and observed a woman lying in a pool of blood. Both saw a knife on the floor near her left hand. Jacoby searched the apartment and noticed blood on the walls, a vase and a pillow. The living-room table was turned over and the wall telephone was on the floor.

After defendant was arrested a few hours later, Rotkovich observed cuts and scrapes on defendant's arm and hand and a bite wound on his thumb, but no knife wounds. Rotkovich testified that defendant was not taken to the hospital for his injuries. On cross-examination, Rotkovich stated that blood was found in defendant's car and on a tissue located on the front seat.

The State stipulated that Dr. Rabih Salloum would testify consistent with his testimony from defendant's first trial. Dr. Salloum stated that Evelyn suffered lacerations to her head, multiple bruises to her back, cuts on her hand and fingers, and two stab wounds to the chest. In his opinion, any of these injuries could have been fatal. He stated that her hand injuries were sustained when she tried to push a knife or sharp object away from her.

The parties stipulated that Officer Badertscher of the Joliet police department would also testify as he did in the first trial. There, he stated that when he apprehended defendant in Joliet he noticed defendant's hand was bleeding and blood on a napkin and clothing on the front seat of the car. Defendant told Badertscher he did not do anything.

Robert Wijas next testified that he was visiting his girlfriend at her 1409 East Ashland Avenue apartment on October 20, 1998, when he heard a woman screaming around 10 p.m. After about 20 minutes, he heard the woman ask a man to leave twice. He then heard a door slam and saw a man leave the building and get into a Chevy Blazer. Wijas called the police and later determined that the screaming came from Evelyn's apartment. He never heard a man scream.

Michael Roston testified for the defense that he owns Roston Corporation, where defendant worked for 10 years running errands

and delivering mail. In the summer of 1998, defendant came to work with bruises and scratches on his face. Roston believed defendant when he said that he sustained the injuries falling off his bicycle. Defendant's mother, Ida Conner, also testified that she visited defendant in the hospital once and she believed him when he told her he had fallen off his bicycle.

Defendant next testified in his own defense. He stated that he and Evelyn both used the Des Plaines apartment during the week and stayed in Joliet on the weekends. In February 1998, defendant spent the weekend in Joliet while Evelyn stayed in Des Plaines. When he returned to Des Plaines on Monday, defendant stated that Evelyn was upset and "jumped on [him]." He started to take his clothes and leave when Evelyn ripped the clothes out of his arms, tore his shirt and hit him. He pushed her off and left. Defendant returned to the apartment with an officer and picked up his clothes.

On October 19, 1998, he spoke with Evelyn, who was unhappy that she had to baby-sit her grandchildren that night. Defendant stated that Evelyn said she wished for a gun to end everything because she was tired of him and her grandchildren and she wanted to go away.

On October 20, 1998, he spoke with Evelyn during the day as usual. She was upset that she had to watch her grandchildren that evening in Des Plaines while defendant stayed in Joliet. That evening, Evelyn called him several times asking what he was doing and when he was returning. Defendant left Joliet at about 8:45 p.m. and stopped for gas and food. When he arrived in Des Plaines, Evelyn asked defendant where he had been. He stated he had been on his way, but she responded that the drive was not that long and accused him of having affairs, which he denied.

Defendant testified that Evelyn then took a knife and said that he was probably sleeping with "Laurie," someone defendant met while he and Evelyn were separated. She tried to stab him and, when he attempted to grab her arm, he felt the knife cut his hand. He released the knife, left the kitchen and hit the dining-room table as Evelyn cut his arm. Defendant then punched her in the face a few times and told her to release the knife, but she refused. Defendant placed her in a "half nelson" position while he was standing behind her. Evelyn bit him on the thumb so he bit her on the shoulder. She escaped and threw a vase at him, and he threw it back at her. Defendant testified that he pushed Evelyn to the floor while she repeatedly told defendant she was going to kill him. He picked up a candlestick and hit her on the back and the neck. When she raised her hands to her head, he hit her hands until she surrendered. He asked her why she was doing this

and she said that he did not care about her. Defendant told her he loved her and continued to hold her on the ground. He picked up the knife and said he was tired of her falsely accusing him. Defendant then took the knife and turned to leave when Evelyn ran up to him, grabbed the blade of the knife and tried to turn it toward him. At that point, defendant backed away and Evelyn told him he was going to jail. She went to pick up the phone and he grabbed it out of her hands and threw it down. Defendant left, stopped at a liquor store and sat in the casino parking lot in Joliet. He was headed toward his mother's house when he was stopped and arrested.

Defendant testified that Evelyn found out about "Laurie" when she discovered a card from her. Evelyn continued asking him if he was seeing other women until he admitted to the affair. Evelyn then "snapped" and threw a porcelain salt shaker at his face and hit him. Defendant stated that they continued living together after this incident and Evelyn wrote him an apology.

On cross-examination, defendant stated that he did not testify at his first trial that he attempted to cripple Evelyn's hands during the struggle or that she stated she wanted a gun. Defendant denied stabbing his wife and stated that the wounds must have occurred while they were wrestling or fighting. He stated that he did not see any blood on her when he left the apartment. When defendant spoke with Detective Rotkovich after he was arrested, defendant told him that when he left the apartment his wife was fine. Further, he said he did not know how Evelyn sustained her injuries. Defendant did not call an ambulance after the incident because he did not know Evelyn was injured badly and he did not call the police.

Defendant was found guilty of attempted first-degree murder and aggravated battery and sentenced to an extended term of 60 years' imprisonment. Defendant's motion for a new trial and motion to reconsider his sentence were denied. He then filed this timely appeal.

■ Defendant first contends that the State failed to disprove beyond a reasonable doubt his claim of self-defense. Self-defense is an affirmative defense and, once raised, the State has the burden of proving beyond a reasonable doubt that defendant did not act in self-defense. *People v. Jeffries*, 164 Ill. 2d 104, 127, 646 N.E.2d 587, 597 (1995). The elements of self-defense are that (1) unlawful force was threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, and (4) the use of force was necessary. *People v. Dillard*, 319 Ill. App. 3d 102, 106, 745 N.E.2d 185, 188 (2001). The standard of review is whether, taking all of the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that defendant was

not acting in self-defense. *Dillard*, 319 Ill. App. 3d at 106-07, 745 N.E.2d at 189.

◼ Defendant argues that Evelyn's testimony contained significant omissions and did not explain defendant's injuries or the condition of the furniture in the apartment. Her testimony was thus incredible, he contends, leaving a reasonable doubt about defendant's guilt. However, the trier of fact makes determinations about witnesses' credibility, draws reasonable inferences from their testimony, and resolves conflicts in the evidence. *People v. Billups*, 318 Ill. App. 3d 948, 954, 742 N.E.2d 1261, 1266-67 (2001). We will not substitute our judgment for that of the trier of fact.

◼ Here, the trial court specifically addressed credibility and stated that "[t]his Court clearly believes the testimony of Evelyn Bryant" and later told defendant "I heard your testimony Mr. Bryant. I didn't believe it." In her testimony, Evelyn stated that defendant instigated the incident, pushing her to the floor and hitting her on the back and head with his fists, a vase and a brass candlestick. He threatened to kill her, stated he hoped she had said good-bye to her grandchildren, and tried to suffocate her with pillows. Defendant then obtained a knife and stabbed her twice in the chest and prevented her from using the telephone or leaving the apartment. Evelyn testified she tried to get the knife from defendant and bent it back toward him. She told defendant to leave several times before he eventually did so. Her testimony, and the testimony of other State witnesses, clearly negates defendant's claim of self-defense. Thus, we find that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found defendant guilty beyond a reasonable doubt and that the State disproved defendant's self-defense claim.

Defendant next argues that his right to due process was violated under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), when the State failed to tender favorable evidence to the defense. Specifically, he maintains that the State and police possessed, and failed to return, his briefcase, which was in his car when he was arrested. He further maintains that in the briefcase was a letter from Evelyn apologizing for physically injuring him on a prior occasion which would show her violent tendencies and affect her credibility. The State responds that neither the State nor the police had possession of the briefcase and that the letter was not favorable to the defense.

◼ Defendant relies upon *Brady*, which holds that the suppression by the State of evidence favorable to the defendant upon request violates due process where the evidence is material to guilt or punishment, regardless of the good or bad faith of the prosecution. *In re C.J.*,

166 Ill. 2d 264, 272, 652 N.E.2d 315, 319 (1995), citing *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. However, the Illinois Supreme Court has found *Brady* ill-suited to cases in which the evidence is lost or destroyed and instead has applied the analysis under *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). *In re C.J.*, 166 Ill. 2d at 272, 652 N.E.2d at 319; *People v. Hobley*, 159 Ill. 2d 272, 307, 637 N.E.2d 992, 1007 (1994).

Here, a photograph introduced into evidence of defendant's car shows a briefcase on the front seat. The Joliet police arrested defendant and first had possession of his vehicle. Their inventory report shows that they did not check the interior of the car or inventory any objects because they were instructed to send the car to the Des Plaines police department for evidence processing. The Des Plaines police department inventory sheet reveals that only shoes, pants, a sweatshirt and a wallet containing money, identification and a credit card were recovered from the vehicle. Bank One, the lienholder of the car, repossessed the vehicle from the Des Plaines police two weeks after defendant's arrest and before defendant filed any discovery requests.

Here, neither police department recovered or inventoried a briefcase or a letter. None of the police officers testified at trial to finding a briefcase. The car has since been repossessed by a lienholder through no fault of the police. The briefcase is no longer in the possession or control of the State and its agents and is considered lost or destroyed. Therefore, we will apply the *Youngblood* analysis.

Under *Youngblood*, when evidence has been lost or destroyed, " 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " *In re C.J.*, 166 Ill. 2d at 273, 652 N.E.2d at 319, quoting *Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337. Achieving a proper balance between promoting the preservation of evidence and not rewarding a defendant for its inadvertent loss may be accomplished through a consideration of (1) the degree of negligence or bad faith by the State in losing the evidence, and (2) the importance of the lost evidence relative to the evidence presented against defendant at trial. *Hobley*, 159 Ill. 2d at 307, 637 N.E.2d at 1008.

■ Here, defendant has not met his burden under *Youngblood*. First, defendant has failed to show any bad faith on the part of the State. The police did not recover or inventory a briefcase. Thereafter, they turned the car over to a lienholder. The release of the vehicle to the lienholder was not due to police negligence or bad faith. Further, defendant failed to mention the briefcase in his discovery requests and motion for the release of personal property before his first trial. An

agreed order entered before the first trial required the Des Plaines police department to release to defendant a wallet, money, credit card and a black briefcase and its contents. Defendant did not file a motion to compel or otherwise bring this issue to the court's attention. Defendant first raised this issue on the day his second trial was to begin and the State responded that this was the first request for the briefcase.

Second, the importance of the lost evidence, the letter within the briefcase, is speculative at best. *In re C.J.*, 166 Ill. 2d at 274, 652 N.E.2d at 320. Although defendant asserts that the letter exists and contains an apology from Evelyn for her prior behavior, stating "the only reason I *** say things and do things to hurt you [is] because I love you so much," we have no independent corroboration as to the letter's existence or content. In denying defendant's motion to dismiss, the court found that there was "no independent basis for assuming what was in the briefcase, that the briefcase contained what the defendant claims it does." Further, the State contends that Evelyn would deny writing such a letter. Even assuming the letter does contain that language, it is vague, does not confirm that Evelyn had previously injured defendant or establish a pattern of violent behavior. In fact, the testimony of both State and defense witnesses at trial revealed that defendant was previously injured by falling off his bicycle, not from an altercation with Evelyn. The letter would not have bolstered defendant's self-defense claim as it would not have determined she was the aggressor here. As discussed above, the overwhelming weight of the evidence at trial proved defendant's guilt beyond a reasonable doubt. We therefore reject defendant's claim.

■ Lastly, defendant contends that his extended-term sentence should be reduced under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Defendant's aggravated battery count merged with the attempted murder and thus he was sentenced only for attempted murder, a Class X felony, normally carrying a 6- to 30-year sentence. During sentencing, the trial court found that the offense committed by defendant was exceptionally brutal and heinous and indicative of wanton cruelty, meriting an extended-term sentence of 60 years' imprisonment pursuant to sections 5—8—2(a)(2) and 5—5—3.2(b)(2) of the Unified Code of Corrections (the Code) (730 ILCS 5/5—8—2(a)(2), 5—5—3.2(b)(2) (West 1998)).

In *Apprendi*, the United States Supreme Court found that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. In *People v. Swift*, 322 Ill. App. 3d 127, 128-29, 750 N.E.2d 294, 295-96 (2001), the

court specifically addressed sections 5—8—2(a) and 5—5—3.2(b)(2), finding that these statutes increased the penalty range for the crime beyond the maximum permitted by statute upon a finding by the trial court that defendant's conduct was exceptionally brutal and heinous, without submitting this issue to a jury. *Swift* then held section 5—8—2 unconstitutional under *Apprendi*. See also *People v. Chanthaloth*, 318 Ill. App. 3d 806, 816, 743 N.E.2d 1043, 1050-51 (2001); *People v. Joyner*, 317 Ill. App. 3d 93, 110, 739 N.E.2d 594, 606-07 (2000); *People v. Beachem*, 317 Ill. App. 3d 693, 708, 740 N.E.2d 389, 399 (2000).

The State responds that, even though the sentencing court and not the trial court determined the offense to be exceptionally brutal and heinous, any error was harmless because a rational trier of fact would have reached the same conclusion beyond a reasonable doubt based on the evidence at trial. The State relies upon *United States v. Nance*, 236 F.3d 820 (7th Cir. 2000), *United States v. Anderson*, 236 F.3d 427 (8th Cir. 2001), and *United States v. Terry*, 240 F.3d 65 (1st Cir. 2001). In those cases, defendants were subjected to a sentence beyond the statutory maximum based on a finding by the trial court at sentencing regarding the amount of drugs involved. The courts found that such a finding by the trial courts violated *Apprendi* but found it was harmless error as no rational jury could have found less than that amount of drugs based on the evidence presented at trial.

We reject the State's contention that the error here was harmless. In these cases involving the quantity of drugs, there was specific evidence at trial indicating the exact quantity involved, and this fact was undisputed by the defendants in *Anderson* and *Terry*. A finding that the crime was exceptionally brutal and heinous indicative of wanton cruelty, however, is a factual question which involves weighing of the evidence at trial. *People v. Peacock*, 324 Ill. App. 3d 749 (2001). Such language is subject to various definitions and interpretations, unlike quantity. While one rational jury could find that an offense was exceptionally brutal and heinous, another could find the opposite based on the same evidence. In this case, we disagree with the State that any rational trier of fact would have found defendant's attempted murder of his wife to be exceptionally brutal and heinous. Therefore, this issue had to be decided by the trial court under *Apprendi* and this was not harmless error.

The State further cites *People v. Jones*, 81 Ill. 2d 1, 405 N.E.2d 343 (1979), *People v. Leger*, 149 Ill. 2d 355, 597 N.E.2d 586 (1992), and *People v. Armstrong*, 183 Ill. 2d 130, 700 N.E.2d 960 (1998), where our supreme court found the failure to submit to the jury the intent element of an offense was harmless. We find all three cases distinguishable. In *Jones*, the court noted that the intent to commit murder was

458

blatantly evident and admitted by defense counsel and the only real issue was identity. *Jones*, 81 Ill. 2d at 10, 405 N.E.2d at 346. *Armstrong* is distinguishable where the sentencing jury was not given an instruction regarding intent during the death penalty eligibility hearing, but that same jury had received an intent instruction during the guilt phase of trial. *Armstrong*, 183 Ill. 2d at 151-52, 700 N.E.2d at 969. And in *Leger*, the court analyzed this issue within the context of an ineffective assistance of counsel claim and found no prejudice to defendant when the jury instructions contained the incorrect statement of intent because "substantial evidence was presented to show that defendant acted with intent to kill." *Leger*, 149 Ill. 2d at 404, 597 N.E.2d at 608. In the present case, as discussed above, the evidence is not clear that the crime was exceptionally brutal and heinous and reasonable juries could disagree. We note also that all three cases were decided before *Apprendi*. We therefore reject the State's argument.

Accordingly, we agree with defendant that his sentence of 60 years' imprisonment cannot stand. We therefore remand this case to the trial court for resentencing on defendant's attempted murder conviction. In light of our decision, we need not address defendant's other argument that a 30-year sentence would be excessive.

For the foregoing reasons, we affirm defendant's convictions, vacate the sentence of 60 years' imprisonment, and remand the cause to the trial court for resentencing consistent with this order.

Affirmed in part and vacated in part; cause remanded with directions.

HARTMAN and BARTH, JJ., concur.