NOTICE

Decision filed 08/25/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230203-U

NO. 5-23-0203

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 21-CF-2583 |
| | ) | |
| CALEB CAMPBELL, | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Presiding Justice McHaney and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to prove that defendant knew or should have known that the individual he struck and killed with his car was a police officer performing his official duties. *Apprendi v. New Jersey*, 530 U.S. 466 (2000), was not violated where defendant waived his right to a jury trial, and the trial judge and the sentencing judge were the same. Since defendant was convicted of failing to report an accident involving personal injury or death, defendant's conviction and sentence for failure to stop after having an accident involving personal injury or death must be vacated as a violation of the one-act, one-crime rule.

¶ 2    Following a bench trial, defendant, Caleb Campbell, was convicted of first degree murder, failure to report an accident involving personal injury or death, and failure to stop after having an accident involving personal injury or death. On direct appeal, defendant contends that the State failed to prove, beyond a reasonable doubt, that defendant knew or should have known that, at the time of the accident, the victim was a police officer. Defendant further argues that his life sentence

1

was imposed in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Finally, defendant argues that his conviction and sentence for failure to stop after having an accident involving personal injury or death must be vacated under the one-act, one-crime rule, where the evidence supporting that conviction is inherent in, and based upon the same conduct, the offense of failure to report an accident involving personal injury or death. For the reasons that follow, we affirm defendant's sentence for first degree murder and vacate defendant's conviction and sentence for failure to stop after having an accident involving personal injury or death.

¶ 3                                I. BACKGROUND

¶ 4      This recitation of the facts includes only those facts necessary to resolve this appeal. We will recite additional facts in the analysis section as needed to address the specific arguments of the parties.

¶ 5      On August 4, 2021, Officer Brian Pierce Jr., of the Brooklyn Police Department, was struck and killed by a motor vehicle that was fleeing the police. The investigation ultimately led to the arrest of defendant. Defendant was charged, initially by information and later by indictment, with: (1) count I, first degree murder (Class M), in violation of section 9-1(a)(2) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(2) (West 2020)); (2) count II, failure to report an accident involving personal injury or death (Class 1), in violation of section 11-401(b) of the Illinois Vehicle Code (625 ILCS 5/11-401(b) (West 2020)); (3) count III, reckless homicide (Class 2), in violation of section 9-3(a) of the Criminal Code of 2012 (720 ILCS 5/9-3(a) (West 2020));[1] (4) count IV, failure to stop after having an accident involving personal injury or death (Class 4), in violation of section 11-401(a) of the Vehicle Code (625 ILCS 5/11-401(a) (West 2020)); and (5) count V,

---

[1]Count III was dismissed on the State's motion during trial.

2

aggravated fleeing or attempting to elude a police officer (Class 4), in violation of section 11-204.1(a)(1) of the Vehicle Code (*id.* § 11-204.1(a)(1)).

¶ 6    At his request, defendant was allowed to proceed *pro se*. Pursuant to section 5-8-1(a)(1)(c)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(iii) (West 2020)), the State filed a notice of intent to seek a mandatory life sentence should defendant be convicted of first degree murder, alleging that defendant attained the age of 18 at the time of the murder, and that Pierce was a peace officer who was killed in the course of performing his official duties. Defendant waived his right to a jury trial. The following evidence was presented during the bench trial.

¶ 7    On August 4, 2021, Terry Pruitt, an officer with the Brooklyn Police Department, was parked in his squad car near Bottoms Up, a night club in Brooklyn. He saw a red Dodge Charger exit the parking lot and accelerate at a high rate of speed. Pruitt estimated that the Charger was going 50-60 miles per hour (mph) in a 15-mph zone. Pruitt decided to conduct a traffic stop and began following the vehicle. He observed the vehicle run a stop sign. Pruitt accelerated in an attempt to catch up with the Charger, which he estimated was then going 60-70 mph in a 30-mph zone. Pruitt then observed the Charger going around a motor vehicle that was stopped at a stop sign, passing that motor vehicle on the right. The Charger drove over a curb and made a left turn onto Route 3, again without stopping. About this time, Pruitt activated the lights on his patrol vehicle. Pruitt estimated the Charger reached speeds of 85-90 mph on this stretch of highway. One vehicle on the highway pulled over to avoid being struck by the Charger.

¶ 8    During this time, Pruitt was in contact with another Brooklyn police officer, Officer Brian Pierce Jr. Pruitt told Pierce that he was pursuing a fleeing vehicle, and that they were headed toward the McKinley Bridge. As Pruitt followed the Charger, it passed several vehicles, again on

3

the right, and ran a red light as those vehicles waited to make a left turn toward the McKinley Bridge. The Charger made a left turn toward the McKinley Bridge, a two lane bridge over the Mississippi River that is commonly used by vehicles fleeing the police. As the Charger approached the bridge, Pruitt estimated that it was traveling at 75-80 mph in a 30-mph zone. The Charger passed several vehicles as it approached the bridge. Shortly thereafter, Pruitt heard Pierce say that he "got a positive spike hit."

¶ 9    As Pruitt drove onto the bridge, he passed seven or eight stopped cars. The first cars he passed were civilian vehicles, then a patrol vehicle belonging to Officer Nicholas Hensley of the Venice Police Department, and finally Officer Pierce's vehicle, which was stopped at the front of the line. The emergency lights were not activated on either police vehicle. As he passed the stopped vehicles, Pruitt noticed debris in the roadway. Once he passed Pierce's vehicle, he could see a body in the roadway approximately 200 feet past Pierce's vehicle. Pruitt drove past the body and stopped, positioning his patrol vehicle to protect the scene.

¶ 10    Upon exiting his vehicle, Pruitt was met by Officer Hensley who told him that the person lying on the road was Officer Pierce. Pruitt approached Pierce and saw that his eyes were open but were not responsive to light. Pierce's left arm was broken, and his leg was almost completely severed from his body. Pierce was not breathing, and Pruitt saw no signs of life.

¶ 11    Pruitt later learned that the Charger was found abandoned approximately 100 yards further down the bridge. It had heavy front end damage and appeared disabled. The damage was not present when Pruitt first saw the Charger leaving the Bottoms Up parking lot. Pruitt's dash camera video and the audio from dispatch were played for the trial court.

¶ 12    Officer Hensley testified that he was employed by the Venice Police Department on the night in question. He was on patrol when he saw a Brooklyn police car with his lights and sirens

4

on pursuing a light-colored sedan. Hensley joined the pursuit. As he and the other officer approached the McKinley Bridge, they terminated the pursuit and planned to drive across the bridge to turn around. As the two officers approached the steel overhead structure of the bridge, the Brooklyn officer stopped his car in the westbound lane and exited. Officer Pierce told Hensley that Pruitt was pursuing a red Charger, and that he was going to "spike it." The traffic behind them stopped.

¶ 13　Pierce stood between Hensley's car and the first car that stopped behind them, a 2019 Ford Escape driven by Timothy King. Pierce deployed his stop sticks, and a black SUV traveling at approximately 80 mph hit the sticks. At the time, Pierce was standing near the yellow lines in the center of the roadway. Hensley said that the "police" lettering on Pierce's back was at eye level. Pierce was struck by the Challenger, which was also traveling at approximately 80 mph and was 1-3 seconds behind the black SUV. Seeing Pierce lying in the roadway at some distance, Hensley ran to Pierce. Hensley stated that Pierce was very mangled, and that he did not see any signs of life. Hensley did not know whether Pierce was retrieving the stop sticks at the time that he was struck by the Charger.

¶ 14　Timothy King testified that he was taking a coworker home after working the night shift. He drove a black 2019 Ford Escape on the McKinley Bridge when he saw two stopped police cars. He stopped behind them. One of the officers deployed a spike strip before a dark Dodge Durango drove past. The officer "went to grab the spike strip, and then the second car came by and impacted him." King testified that the second car was an orangish red Dodge Challenger traveling between 75 and 90 mph. King said that after the Challenger struck Pierce, "it sounded like it revved up even higher like to try to go faster." According to King, after the Durango passed by them, Pierce stepped into the opposite lane to retrieve the spike strip and was bent over at the moment of impact.

5

¶ 15   Trooper Jeremy Mueller of the Illinois State Police testified "as an expert in the area of crash reconstruction." Mueller testified that he arrived at the scene at approximately 4:35 a.m. on the date of the occurrence. Based upon his investigation, including his observation that Officer Pierce had been thrown more than 269 feet from the point of impact and the absence of skid marks either before or after the point of impact, Mueller estimated that the Charger was traveling somewhere between 82 and 98 mph at the time of the impact. Mueller concluded that the primary cause of the crash was defendant's fleeing and eluding and speeding.

¶ 16   Other evidence established that Officer Pierce's blood was on the outside of the Challenger, and that blood from the defendant was found on the instrument panel in front of the driver's seat. Various other items were collected from inside the car: a handgun, cell phones (including one owned by defendant's fiancée, Miracle Johnson), and mail addressed to defendant. A yellow cap was found on the roadway at the scene. The State introduced video evidence from both interior and exterior cameras at the Bottoms Up night club. The videos showed a person, later identified as the defendant, wearing a yellow hat at the nightclub, and also showed defendant and Johnson exit the club and enter the Challenger. Neither of them showed signs of physical impairment while walking to the car. The person with the yellow hat was the driver. The police also recovered video from a gas station in St. Louis near the McKinley Bridge. Two pedestrians appearing in that video, coming from the area of the bridge, matched the description of the suspects from the Bottoms Up videos.

¶ 17   Defendant's fiancée, Miracle Johnson, identified the person in the yellow hat from the Bottoms Up videos as the defendant. She testified that defendant drove the Charger when they left the club. When asked whether defendant hit someone on the bridge, she answered, "I guess so," although when later asked, "I mean, you were in the car whenever the defendant hit Officer Pierce,

right?" she answered, "Yes." As for the rest of her testimony, Johnson's answers were generally vague and evasive despite having been granted use immunity. Johnson denied that the two of them consumed any drugs or alcohol that night and claimed that she could not clearly recall what happened after they left the club. Under questioning from defendant, Johnson said it was possible someone spiked her drink.

¶ 18    Following his arrest on August 20, 2021, defendant was interviewed by Special Agent Michael Lowery from the Illinois State Police. The video recording of his statement was played for the court. In his statement, defendant told the police that he had been at the Bottoms Up night club on the night in question. Defendant told police that someone had stolen his car and the yellow hat he was wearing that night and admitted that he had not called the police to report the carjacking. Defendant also told the police that he got a ride home with someone but could not provide any details.

¶ 19    Special Agent Lowery testified that in addition to interviewing defendant, he reviewed surveillance video from the Bottoms Up night club. Lowery did not find any evidence to support defendant's claim that he had been carjacked that night. Rather, the video showed that defendant walked across the parking lot, got into his car, and drove away. The State rested.

¶ 20    Defendant testified on his own behalf. Defendant said that after arriving at the club, he purchased an orange juice. After a few hours of interacting with other people, defendant "began to feel strange and unusual." Defendant thought that he was robbed and suggested that whatever made him feel "awkward" may have caused him to hallucinate. Several days later, he learned that his car had been located and was involved in an investigation into the death of a police officer. Defendant told the court that he did not think he was a suspect due to what he "honestly thought

7

took place after leaving the club." Defendant testified that he told Special Agent Lowery everything he knew to the best of his ability.

¶ 21    On cross-examination, defendant testified that there was a "high probability" that he drove the red Charger and later admitted that he drove the car off the lot that night. Defendant admitted that the video of him walking out of the club did not show him stumbling. Defendant also admitted that he generally drinks when he goes to the club but said that he was not drinking that night. He also smokes and sometimes takes pills when he goes to the club, but again, he testified that he did not do that on the night in question. When shown a picture of a firearm in his car, defendant denied it was his gun and testified that he had no knowledge of its presence in his car. Defendant further admitted that, at the time of the incident, there was warrant for his arrest out of Missouri. Although defendant did not want to directly admit that he was driving the car as it was being pursued by Officer Pruitt, he admitted that it was "probably" him.

¶ 22    Defendant called Michael Cowsert to testify. Cowsert was qualified as an expert in accident reconstruction. Cowsert calculated the speed of the Charger as being between 64.5 and 71.2 mph at the time of the impact. Regarding a driver's ability to perceive and react to a hazard, Cowsert testified that, based upon research in his field, at nighttime "a person would require 1.8 to 2.5 seconds to perceive and react to a hazard." Cowsert noted that this does not mean that the person could avoid the hazard and that additional distance would be needed to evade the potential hazard. According to Cowsert, Pierce was "out there for a very, very short period of time which would not give enough time for somebody to perceive, recognize, and react to that hazard." Cowsert concluded that "the cause of the accident was based upon Caleb Campbell's decision not to yield to westbound traffic which was stopped in the westbound lane on McKinley Bridge but instead to

8

travel in the eastbound lanes of traffic over the posted speed limit which ultimately resulted in contacting Trooper [*sic*] Pierce."

¶ 23    After the close of evidence and closing arguments, the trial court took the matter under advisement. The following day, the court announced its verdict. The court first found defendant not guilty of aggravated fleeing and eluding (count V), finding that the State failed to present evidence (1) that Officer Pruitt was in uniform during the pursuit, and (2) that Officer Pruitt used his siren in conjunction with his flashing lights. Next, the court found defendant guilty of both failure to report an accident involving personal injury or death (count II) and failure to stop after having an accident involving personal injury or death (count IV). In reaching its conclusion, the court noted that the bridge "is very well lit with tightly spaced overhead lights." The court also noted that Officer Pierce was standing in front of a car with its headlights on at the time he was struck, and concluded that under the circumstances, "a person standing in or adjacent to the roadway would have been clearly visible."

¶ 24    Turning to the first degree murder charge, the trial court noted that notwithstanding the fact that the State dismissed the reckless homicide charge during the trial, it "could nevertheless find the defendant guilty of the lesser charge of reckless homicide." The court then stated that "the issue is whether the defendant knew his acts created a strong probability of death or great bodily harm or whether he was simply acting in a reckless manner." The court then noted that the State sought an enhanced sentence based upon Pierce being a police officer. The court specifically found "that at the time [Pierce] was struck on the bridge that he was a peace officer acting in the course of his official duties." The court further found that the evidence was clear that defendant was fleeing from Officer Pruitt, and that defendant had motives to flee in that he had an active warrant for his arrest and had a loaded pistol in the backseat of his car. Regarding defendant's speed, the

9

court gave reasons for rejecting defendant's expert's conclusion, and found consistent with the State's expert that defendant was traveling between 82 and 98 mph. Given the circumstances, the court concluded "that Mr. Campbell was consciously aware but simply did not care that his conduct created a strong probability of death or great bodily harm." Accordingly, the court found defendant guilty of first degree murder and set the matter for sentencing.

¶ 25    At sentencing, the State asked the trial court to impose a sentence of natural life for the murder of Officer Pierce, arguing that "[t]his is what the law requires pursuant to 730 ILCS 5/5-8-2(1)(c)(iii) as the defendant was 18 at the time of the commission of the murder and he was found guilty of murdering a peace officer who was in the course of performing his official duties as Officer Brian Pierce was." The State also asked the court to sentence defendant to 3 years in prison on the failure to stop after an accident involving personal injury or death, 15 years in prison on the failure to report an accident involving personal injury or death, and for the sentence on the latter to run consecutive to the sentence of the murder charge pursuant to section 5-8-4(d)(1) of the Unified Code of Corrections. 730 ILCS 5/5-8-4(d)(1) (West 2020).

¶ 26    The trial court asked defendant for argument as to the appropriate sentence. The following exchange occurred:

> "DEFENDANT CAMPBELL: I ask that the Court impose the minimum sentences for all the charges concurrent and I object to natural life, because they would have to prove that [I] knew or should have known that the murdered individual was a peace officer and they failed to prove that I even seen Officer Pierce. It would be inappropriate to sentence [me] to natural life in prison.
>
> ***
>
> THE COURT: [State], how does the State address the last portion of that subparagraph in 5/5-8-4, that the defendant knew or should have known that the murdered individual was a peace officer? You argued the other elements, I'm just curious what your argument is on that.

[THE STATE]: Yes, Your Honor. Officer Pierce was standing outside at a roadblock with multiple other police vehicles, he was dressed in a police uniform. I think anyone in that situation that the defendant would have been in would have known that Officer Pierce was a police officer.

THE COURT: Mr. Campbell, anything else you want to say on that point?

DEFENDANT CAMPBELL: Yes. He was standing in between two SUVs which could—would be an obstruction to where he could not be seen by the driver until—so far even if he was dressed in police uniform, the emergency lights were not activated to indicate those vehicles were police vehicles and we cannot assume that he was seen by the driver."

¶ 27    The trial court sentenced defendant to 3 years in the Illinois Department of Corrections (DOC) on the failure to stop after having an accident involving personal injury or death charge, and 10 years in the DOC on the failure to report an accident involving personal injury or death. In pronouncing defendant's sentence, the judge stated:

"As to Count I, First Degree Murder, pursuant to 5/5-8-1, which has been referenced previously, the Court does find that you were over the age of 18 at the time the murder was committed, Officer Brian Pierce, Jr., was a peace officer engaged in performing his official duties at the time he was killed, I do find given all the circumstances in this case that you knew or should have known that the person you killed was a peace officer to stop traffic on the bridge during a high speed pursuit. This was a very well-lit area, headlights were illuminating in addition to the extensive overhead lighting on that bridge. Officer Pierce was dressed in uniform. Certainly given the nature of your fleeing and the officers pursuing certainly wasn't unreasonable or should have been expected by you that officers would be attempting to stop you.

So given all of that I do find that you knew or should have known that Brian Pierce, Jr. was a peace officer acting in the line of duty at the time you hit him with your vehicle."

¶ 28    This timely appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30    On appeal, defendant first argues that his natural life sentence is in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and Illinois law in that the State failed to prove beyond a reasonable doubt that he knew or should have known that Officer Brian Pierce was a police officer

11

at the time of the accident that resulted in Pierce's death. Defendant also argues that his conviction for leaving the scene of an accident involving personal injury or death should be vacated under the one-act, one-crime rule. For the reasons that follow, we find that the evidence was sufficient to prove that defendant knew or should have known that the individual he struck and killed with his car was a police officer performing his official duties. *Apprendi* was not violated where defendant waived his right to a jury trial, and the trial judge and the sentencing judge were the same. However, because defendant was convicted of failing to report an accident involving personal injury or death, defendant's conviction and sentence for failure to stop after having an accident involving personal injury or death must be vacated as a violation of the one-act, one-crime rule.

¶ 31    Turning to the first issue, defendant specifically argues (1) that the fact that the trial judge did not find that defendant knew or should have known that Pierce was a peace officer at the time of the verdict is a violation of *Apprendi*, and (2) the State failed to prove, beyond a reasonable doubt, that he knew or should have known that Pierce was a peace officer at the time he was killed.

¶ 32    In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The Illinois Supreme Court has "held that facts taking a sentence for first degree murder above the sentencing range of 20 to 60 years' imprisonment must be found by a jury beyond a reasonable doubt." *People v. Nitz*, 219 Ill. 2d 400, 405 (2006) (citing *People v. Swift*, 202 Ill. 2d 378, 392 (2002)); see also 725 ILCS 5/111-3(c-5) (West 2020) (if an alleged fact, other than a prior conviction, is not an element of an offense but is going to be used to increase the sentence range beyond the statutory maximum, the alleged fact must be submitted to the fact finder and proven beyond a reasonable doubt).

12

¶ 33    As noted above, the State filed a notice of intent to seek a mandatory life sentence pursuant to section 5-8-1(a)(1)(c)(iii) of the Unified Code of Corrections, which provides, in pertinent part, as follows:

> "(c) the court shall sentence the defendant to a term of natural life imprisonment if the defendant, at the time of the commission of the murder, had attained the age of 18, and:
>
> * * *
>
> (iii) is found guilty of murdering a peace officer *** when the peace officer *** was killed in the course of performing his official duties, *** and the defendant knew or should have known that the murdered individual was a peace officer ***."

730 ILCS 5/5-8-1(a)(1)(c)(iii) (West 2020).

¶ 34    Since the provisions of section 5-8-1(a)(1)(c)(iii) take the sentence range above the statutory maximum of 60 years' imprisonment for first degree murder, the State is required to submit these alleged facts to the fact finder and to prove them beyond a reasonable doubt. *Nitz*, 219 Ill. 2d at 405; 725 ILCS 5/111-3(c-5) (West 2020).

¶ 35    In the case before us, at the time of the verdict, the trial court failed to make a factual finding regarding the third element of the enhancement, specifically, that the trial court failed to find that, at the time of the murder, defendant knew or should have known that Officer Pierce was a peace officer. The State does not dispute this fact. The State argues that the trial court's failure to make the appropriate finding at trial is harmless error. We agree with the State.

¶ 36    As noted above, *Apprendi* requires that the trier of fact must find any fact that increases the penalty for a crime beyond a reasonable doubt. *Apprendi*, 530 U.S. 466. While usually an *Apprendi* finding will be made at trial, *Apprendi* does not specifically require the enhancement findings be made at a certain point in the proceedings. Therefore, in this case, it is unclear whether the trial court erred where it failed to expressly set forth its findings during the guilt phase of the

13

proceedings but instead set forth its findings during the sentencing phase. We need not make an express finding on whether the trial court erred by failing to make its findings at the time of the verdict where any error was harmless.

¶ 37    Initially, we note that in support of his claim, defendant cites *People v. Bryant*, 325 Ill. App. 3d 448 (2001). In *Bryant*, the defendant was charged with several offenses including attempted first degree murder and aggravated battery. *Id.* at 450. A jury found defendant guilty of aggravated battery but could not reach a verdict on the attempted murder charge. *Id.* Defendant was granted a new trial and opted for a bench trial. *Id.* The trial court found defendant guilty of attempted first degree murder and aggravated battery. *Id.* at 453. At his sentencing hearing, the trial court found that the offense committed by the defendant was exceptionally brutal and heinous and indicative of wanton cruelty, meriting an extended term sentence of 60 years in prison pursuant to sections 5-8-2(a)(2) and 5-5-3.2(b)(2) of the Unified Code of Corrections (730 ILCS 5/5-8-2(a)(2), 5-5-3.2(b)(2) (West 1998)). *Id.* at 456. On appeal, the defendant argued that the extended term sentence was in violation of *Apprendi*. *Id.* at 456. The *Bryant* court agreed, rejecting the State's argument that "even though the sentencing court and not the trial court determined the offense to be exceptionally brutal and heinous, any error was harmless because a rational trier of fact would have reached the same conclusion beyond a reasonable doubt based on the evidence at trial." *Id.* at 457.

¶ 38    The *Bryant* court distinguished the cases relied upon by the State, noting that some of the cases relied upon by the State involved a quantity of drugs, and in those cases, there was "specific evidence at trial indicating the exact quantity involved" (*id.*), whereas a "finding that a crime was exceptionally brutal and heinous and indicative of wanton cruelty *** is a factual question which involves weighing of the evidence at trial." *Id.* Since "[s]uch language is subject to various

14

definitions and interpretations, unlike quantity" (*id.*), the *Bryant* court disagreed with the State's assertion "that any rational trier of fact would have found the defendant's attempted murder of his wife to be exceptionally brutal and heinous." *Id.* The *Bryant* court also distinguished other cases cited by the State in support of its harmless error argument. Those cases involved a finding of harmless error where the respective juries had not been properly instructed on the intent element of the offenses at trial or during a death penalty eligibility hearing. *Id.* at 457-58. The *Bryant* court also noted that those cases were decided prior to the *Apprendi* decision. *Id.*

¶ 39    The specific facts of *Bryant* are distinguishable from the facts before us. First, the timing of Bryant's bench trial is unclear. Although it appears that Bryant filed his notice of appeal in 2000, the *Bryant* court does not state when either the bench trial or the sentencing hearing was held. Given that *Apprendi* was decided on June 26, 2000, we cannot determine whether the trial court was aware of the need to find the defendant's exceptionally brutal and heinous behavior beyond a reasonable doubt. Second, the *Bryant* opinion is unclear as to whether the trial court judge and the sentencing court judge were one and the same. In contrast, in the instant case, we know that the judge that rendered the verdicts was the same judge who later made his finding, based upon the trial evidence, that defendant knew or should have known that Pierce was a peace officer. Finally, since *Bryant* was decided, the Illinois Supreme Court has "applied plain-error review to affirm a murder defendant's life sentence imposed in violation of *Apprendi*, concluding that a jury would have found that the crime was committed in a brutal and heinous manner indicative of wanton cruelty." *Nitz*, 219 Ill. 2d at 405 (citing *People v. Kaczmarek*, 207 Ill. 2d 288, 303-04 (2003)). Accordingly, we decline to apply the reasoning of *Bryant* to the instant case.

¶ 40    With regard to *Apprendi* violations, the harmless-error analysis applies when the defendant has made a timely objection. *Nitz*, 219 Ill. 2d at 409-10 (citing *People v. Thurow*, 203 Ill. 2d 352,

15

363 (2003)). If the defendant fails to object to an *Apprendi* violation, then the plain-error analysis applies. *Id.* at 410 (citing *People v. Thurow*, 203 Ill. 2d 352, 363 (2003)). "Under a harmless-error analysis, the State must prove beyond a reasonable doubt that the result would have been the same absent the error." *Id.* (citing *Thurow*, 203 Ill. 2d at 363). "Under plain-error analysis, the defendant must persuade the court that the error was prejudicial." *Id.* (citing *Thurow*, 203 Ill. 2d at 363).

¶ 41    In *Thurow*, the Illinois Supreme Court noted that the appropriate test in determining if a constitutional error is harmless is: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " *Thurow*, 203 Ill. 2d at 368-69 (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). We acknowledge the State did not list the mental state element in its notice of intent to seek a life sentence, and we further acknowledge that the State did not argue this element during closing argument. However, as noted by the State, the trial court is presumed to know the law and to apply it properly, and that presumption is only rebutted when the record contains "strong affirmative evidence to the contrary." *People v. Howery*, 178 Ill. 2d 1, 32-33 (1997). We find no strong affirmative evidence in the record to conclude that the trial court did not know the law or apply it properly.

¶ 42    We also agree with the State's finding that this court need not speculate as to whether the finder of fact at defendant's trial would have made the necessary finding with regard to whether defendant knew or should have known that Pierce was a peace officer. As noted above, the trial court judge and the sentencing court judge were the same, and after hearing defendant's argument and the State's reply, the judge made his finding and articulated the evidence supporting that finding:

> "As to Count I, First Degree Murder, pursuant to 5/5-8-1, which has been referenced previously, the Court does find that you were over the age of 18 at the time the murder was committed, Officer Brian Pierce, Jr., was a peace officer engaged in performing his official duties at the time he was killed, I do find given

16

all the circumstances in this case that you knew or should have known that the person you killed was a peace officer to stop traffic on the bridge during a high speed pursuit. This was a very well-lit area, headlights were illuminating in addition to the extensive overhead lighting on that bridge. Officer Pierce was dressed in uniform. Certainly given the nature of your fleeing and the officers pursuing certainly wasn't unreasonable or should have been expected by you that officers would be attempting to stop you.

So given all of that I do find that you knew or should have known that Brian Pierce, Jr. was a peace officer acting in the line of duty at the time you hit him with your vehicle."

Assuming, as both parties have done, that the trial court erred by failing to make the finding at trial, under these circumstances we find that a rational trier of fact would have found defendant guilty beyond a reasonable doubt absent the claimed error. There can be no better source than the fact finder himself. Accordingly, any error made by the trial court by failing to address defendant's mental state while announcing the verdict is harmless.

¶ 43 Next, we address defendant's argument regarding the sufficiency of the evidence as it pertains to whether defendant knew or should have known that Pierce was a peace officer at the time that he was killed. When considering a challenge to the sufficiency of the evidence, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Bush*, 2023 IL 128747, ¶ 33 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* (citing *People v. Schmalz*, 194 Ill. 2d 75, 80 (2000)).

17

¶ 44    This standard of review "is applicable in all criminal cases, regardless of whether the evidence is direct or circumstantial." *People v. Campbell*, 146 Ill. 2d 363, 374 (1992) (citing *People v. Pintos*, 133 Ill. 2d 286, 291 (1989)). Circumstantial evidence is sufficient to support "a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *Id.* at 379. This "standard gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* at 375 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). For this reason, a reviewing court "will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* (citing *People v. Young*, 128 Ill. 2d 1, 51 (1989)). We "will not reverse a criminal conviction unless the evidence is so unreasonable, so improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.* (citing *Collins*, 106 Ill. 2d at 261).

¶ 45    Defendant relies upon several facts in support of his argument that the evidence was insufficient to prove what he knew or should have known at the time that he hit Officer Pierce. For example, defendant argues the evidence demonstrated that (1) neither Officer Pierce nor Officer Hensley activated the flashing red and blue lights on their squad cars; (2) defendant traveled in excess of 80 mph; (3) defendant's car traveled only one to three seconds behind the first speeding vehicle; (4) Officer Pierce stood between two sports utility vehicles (SUVs), which may have impaired defendant's ability to see Pierce; (5) Officer Pierce stepped out from between the two SUVs to retrieve the stop sticks after the first vehicle drove over them; and (6) Pierce may have been bending down to grab the stop sticks at the time that he was struck. Defendant also notes that the State's own expert, Trooper Mueller, opined that there was "no evidence" regarding when Pierce would have become visible to defendant, but only that Pierce "could have been visible."

18

Finally, defendant contends that the State itself elicited testimony that no one knew whether defendant was even paying attention to the road at the time of the impact.

¶ 46    Defendant's argument is flawed in that it focuses only on the issue of what defendant *knew* at the moment of impact. The statute, however, also allows for the imposition of an extended term sentence if the State has proven, beyond a reasonable doubt, that the defendant *should have known* that the murdered person was a peace officer. 730 ILCS 5/5-8-1(a)(1)(c)(iii) (West 2020).

¶ 47    A defendant's mental state is usually proved by circumstantial, as opposed to direct, evidence. *People v. Ortiz*, 196 Ill. 2d 236, 260 (2001). "Knowledge of a material fact includes awareness of the substantial probability that the fact exists." 720 ILCS 5/4-5(a) (West 2020). "Knowledge is different from what a defendant 'should have known.' " *People v. Trajano*, 2018 IL App (2d) 160322, ¶ 25 (citing *People v. Nash*, 282 Ill. App. 3d 982, 986 (1996)). As the *Trajano* court noted, " ' "[S]hould have known" implicates "the standard of care which a reasonable person would exercise" and therefore pertains to the lesser mental states of "recklessness" and "negligence." ' [Citation.]" *Id.* "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow *** and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2020). "A person is negligent, or acts negligently, when that person fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow *** and that failure constitutes a substantial deviation from the standard of care that a reasonable person would exercise in the situation." *Id.* § 4-7.

¶ 48    The evidence at defendant's bench trial demonstrated that defendant was fleeing from the police while driving recklessly and at high speeds. He ran a stop sign after improperly passing a

19

motor vehicle that was approaching the stop sign on the right. Although Officer Pruitt's siren was not on, his flashing lights were activated. Defendant drove at excessive speeds, passing other vehicles before running a red light while making a left hand turn toward the McKinley Bridge. Officer Pruitt's dashcam video shows that, even while traveling at a high rate of speed, it was clear that vehicles were stopped on the McKinley Bridge. Encountering the stopped traffic, defendant chose to continue driving at speeds between 82 and 98 mph, at least two-and-a-half times greater than the posted speed limit of 35 mph, while passing the stopped vehicles and while in a "no passing" zone. Notwithstanding the fact that neither Officers Pierce nor Hensley activated their emergency lights, the McKinley Bridge was well lit with tightly spaced overhead lights. Furthermore, as defendant approached Officer Pierce, Pierce stood behind two squad cars and in front of Timothy King's Ford Escape's headlights while in uniform. Moreover, the record demonstrates that defendant had a motive for fleeing: he had an active warrant for his arrest and a loaded firearm in his motor vehicle. It is not unreasonable to infer that a person fleeing from the police should anticipate a roadblock, particularly at a chokepoint like the McKinley Bridge presents.

¶ 49 Defendant's actions demonstrate that he consciously disregarded a substantial and unjustifiable risk that circumstances existed or that a result would follow, and that his disregard of the circumstances constituted a gross deviation from the standard of care that a reasonable person would have exercised in the situation. Indeed, the evidence demonstrated that had defendant exercised *any* reasonable standard of care, he would have seen that a police presence was the cause of the stoppage on the bridge. Under these circumstances, we find that a rational trier of fact could conclude beyond a reasonable doubt that that defendant knew or *should have known* that Officer Pierce was a peace officer. Stated another way, the evidence was not "so unreasonable, so

20

unprobable, or so unsatisfactory as to justify a reasonable doubt" as to whether defendant should have known that Pierce was a peace officer. For this court to find otherwise would allow a defendant to avoid an enhanced sentence for his actions by consciously engaging in behavior so reckless that it negates the mental state of what he knew or should have known. Such a result is untenable. For these reasons, defendant's natural life sentence pursuant to section 5-8-1(a)(1)(c)(iii) of the Unified Code of Corrections is affirmed.

¶ 50    Finally, we consider defendant's argument that his conviction and sentence for leaving the scene of an accident involving personal injury or death must be vacated under the one-act, one-crime rule. Defendant argues that the conviction for this offense is inherent in and based upon the same conduct that led to his conviction and sentence for the more serious offense of failing to report an accident involving personal injury or death. Defendant acknowledges that this issue was not properly preserved for appeal and asks this court to review the matter under the second prong of the plain-error doctrine. The State concedes that defendant's conviction for leaving the scene of an accident involving personal injury or death is a one-act, one-crime violation, and likewise invites this court to review the matter under second-prong plain error. We accept the State's confession.

¶ 51    Application of the one-act, one-crime doctrine is a question of law that is to be reviewed *de novo*. *People v. Artis*, 232 Ill. 2d 156, 161 (2009). As noted by the parties, "[a]n alleged one-act, one-crime violation is reviewable under the second prong of the plain-error doctrine because it affects the integrity of the judicial process." *People v. Smith*, 2019 IL 123901, ¶ 14. The first step in a plain-error analysis is to determine whether an error occurred. *Id.* The one-act, one-crime doctrine prohibits multiple convictions for multiple offenses based on the same physical act. *People v. Coats*, 2018 IL 121926, ¶ 121. Where multiple convictions have been imposed in

21

violation of the one-act, one-crime doctrine, the court must vacate all but the most serious offense. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). Our supreme court devised a two-step analysis for determining whether a one-act, one-crime violation has occurred. *Coats*, 2018 IL 121926, ¶ 12. First, the court determines whether the defendant's conduct constituted a single act or multiple acts. *People v. Harvey*, 211 Ill. 2d 368, 391 (2004).

¶ 52    Defendant was convicted of both failure to stop after having an accident involving personal injury or death (625 ILCS 5/11-401(a) (West 2020)) and failure to report an accident involving personal injury or death (*id.* § 11-401(b)). The parties agree that defendant's convictions were based upon a single crash, and both parties agree that a plain reading of the statute demonstrates that one cannot commit the more serious offense of failure to report an accident involving personal injury or death under section 11-401(b) without having first committed the offense of failure to stop after having an accident involving personal injury or death. *Id.* § 11-401. Indeed, section 11-401(b) begins with the clause, "Any person who has failed to stop or to comply with the requirements of paragraph (a) ***." We find defendant's argument and the State's confession to be well-taken. Consequently, we vacate defendant's conviction and sentence on count IV, failure to stop after having an accident involving personal injury or death, and remand for the issuance of an amended judgment of sentence.

¶ 53                            III. CONCLUSION

¶ 54    For the foregoing reasons, we affirm defendant's sentence for first degree murder, vacate defendant's conviction and sentence as to count IV, and remand with directions.


¶ 55    Affirmed in part and vacated in part; cause remanded with directions.